IN THE SUPREME COURT OF TENNESSEE

AT NASHVILLE

**FILED**

**September 3, 1996**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| GENEVA COFFEY, | ) | FOR PUBLICATION |
| | ) | Filed: September 3, 1996 |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | OVERTON CIRCUIT |
| | ) | |
| FAYETTE TUBULAR PRODUCTS, | ) | Hon. John J. Maddux, Jr., Judge |
| LIVINGSTON DIVISION, DANAHER | ) | |
| CORPORATION | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | No. 01S01-9601-CV-00003 |

For Plaintiff-Appellant:

Ernest C. Onks, Sr.
Cookeville, Tennessee

Ronald Thurman
Craig P. Fickling
Ronald Thurman & Associates
Cookeville, Tennessee

For Defendant-Appellee:

W. Kerby Bowling
W. Kerby Bowling II
Joseph M. Crout
M.V. Tichenor
Memphis, Tennessee

# O P I N I O N

COURT OF APPEALS REVERSED;
JUDGMENT OF TRIAL COURT REINSTATED.

DROWOTA, J.

In this retaliatory discharge action, the plaintiff, Geneva Coffey, appeals from two aspects of the Court of Appeals' judgment: (1) its suggested remittance of the punitive damage award from $500,000 to $150,000; and (2) its disallowance of the $20,000 in "front pay" awarded by the trial court. After a careful consideration of the law and the record in this case, we conclude that the Court of Appeals erred in both respects. Therefore, we reverse that court's judgment, and reinstate, in its entirety, the judgment rendered by the trial court.

## FACTS AND PROCEDURAL HISTORY

Geneva Coffey began work on the production line for Fayette Tubular Products, a manufacturer of air conditioning units, in April 1988. On July 19, 1990, Coffey injured her back on the job; she was paid worker's compensation benefits for this injury and placed on leave until January 1991. After returning to work, Coffey re-injured her back in March 1991 and was unable to return to work until May of that year.

In June 1991, Coffey brought a lawsuit against Fayette Tubular for worker's compensation benefits. On July 15, 1991, the day Fayette Tubular was served with the complaint, a representative of the company informed Coffey that her position was to be eliminated; and a few days later, she was assigned to a more strenuous job. Coffey began to have more difficulties with her back and requested medical treatment. She soon found out, however, that her worker's compensation claim would not be honored. She sought medical treatment independently from the company-approved doctor and reported the results of this visit to Bob Farris, Fayette

2

Tubular's Human Resources Director, who told her that she did not need treatment and, furthermore, that "worker's compensation was going to stop because it was taking the company under."

On July 31, 1991, Coffey received a written excuse from her physician stating that she was not to return to work until August 6. On that same date, however, Fayette Tubular made the decision to fire Coffey, the purported reason being that she had violated a company policy by being absent from work for three consecutive days without giving the company notice. When Coffey received notification of her termination by mail on August 1, 1991, she called Farris and told him that she had left a message explaining the reasons for her absence on the company's answering machine and that her termination was, thus, unfair. After denying that any message had been left, Farris answered Coffey's charge of unfairness with the statement that "there are a lot of unfair things in life;" he then and hung up on her.

Coffey was not released by the company-approved physician until February 1992, at which time she filed an application with the Department of Employment Security for unemployment benefits. This application was opposed by Fayette Tubular, but after a hearing the department found that Coffey had not violated the company policy requiring notification of absences. After the department rendered its decision, Fayette Tubular offered to reinstate Coffey if she would accept a substantially reduced compromised settlement of her worker's compensation claim. Coffey refused to accept this offer.

Coffey subsequently sued Fayette Tubular, alleging that it had discharged her

3

in retaliation for making a worker's compensation claim. Fayette Tubular denied the allegations, claiming that Coffey was fired for violating the company policy regarding notification of absences. During the trial, two former employees of Fayette Tubular testified, over the defendant's objection, that they had filed worker's compensation claims and were subsequently discharged. After the conclusion of the proof, the jury returned its verdict, finding for the plaintiff and awarding $30,000 in compensatory damages and $1,500,000 in punitive damages. On its review of the verdict, the trial court first reduced the punitive damages awarded by the jury to $500,000, the amount prayed for in the plaintiff's complaint. The court then proceeded, however, to review and approve the reduced award. Finally, the trial court awarded $20,000 to the plaintiff as "front pay."

Fayette Tubular then filed a motion pursuant to Rule 59 of the Tennessee Rules of Civil Procedure in which it requested any of the following forms of relief: (1) a new trial; (2) judgment in accordance with a motion for directed verdict; (3) amendment of the judgment; and (4) remittitur. After conducting a second review of the punitive damages award, the trial court denied the motion in its entirety.

Fayette Tubular appealed from this judgment to the Court of Appeals, which affirmed both the company's liability for retaliatory discharge and the $30,000 compensatory damage award. The Court, however, remitted the punitive damage award from $500,000 to $150,000, and it vacated the $20,000 in front pay awarded by the trial court. The plaintiff accepted the suggested remittitur under protest, Tenn. Code Ann. § 20-10-103; and both parties applied to this Court for permission to appeal pursuant to Tenn. R. App. P. 11. We granted the plaintiff's application in

4

order to consider the issues of punitive damages and front pay.

I.

The first issue for our consideration is whether the Court of Appeals erred in remitting the punitive damages from $500,000 to $150,000. Initially, it is well-settled that punitive damages are not intended to compensate an injured plaintiff but may be awarded by the jury for the purposes of punishing wrongdoers and deterring them from similar conduct in the future. Huckeby v. Spangler, 563 S.W.2d 555, 558-59 (Tenn. 1978). Moreover, we have specifically held that punitive damages may be assessed in retaliatory discharge cases to insure that employers comply with the duties imposed upon them by the Tennessee Worker's Compensation Act. Clanton v. Cain-Sloan, 677 S.W.2d 441, 445 (Tenn. 1984).

The availability of punitive damages is, however, by no means unlimited. In Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 900-01 (Tenn. 1992), we held that in order to recover punitive damages, a plaintiff must prove, by clear and convincing evidence, that the defendant acted (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly. Furthermore, in Hodges we set forth a list of factors to guide the discretion of the fact finder in assessing the amount of punitive damages. We instructed the fact finder to consider:

(1) The defendant's financial affairs, financial condition, and net worth;

(2) The nature and reprehensibility of the defendant's wrongdoing, for example

5

(A) The impact of defendant's conduct on the plaintiff, or

(B) The relationship of defendant to plaintiff;

(3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;

(4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

(5) The expense plaintiff has borne in the attempt to recover the losses;

(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

(8) Whether, once the misconduct became known to the defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused;

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

Hodges, 833 S.W.2d at 901-02.

Finally, we made it very clear that the trial court must thoroughly review any award of punitive damages made by the jury. We stated:

> After a jury has made an award of punitive damages, the trial judge shall review the award, giving consideration to all matters on which the jury is required to be instructed. The judge shall clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed.

Hodges, 833 S.W.2d at 902.

In the case before us, the trial court reduced the punitive damages award from

6

$1,500,000 to $500,000, the amount demanded in the ad damnum clause of Coffey's complaint. The Court of Appeals, however, reduced the punitive damages by an additional $350,000, resulting in a final award of $150,000. The court supported its judgment as follows:

> Defendant insists that the trial judge, in addition to reducing the verdict for punitive damages to the ad damnum stated in the complaint, should have reviewed the verdict as required by Hodges v. Toof, and suggested an appropriate remittitur. This court agrees with this latter insistence. After a review of all the evidence in the record, this court concludes that an appropriate amount of punitive damages would be $150,000, and will suggest a remittitur to reduce the award to this amount.

With all due respect, we cannot agree that the trial judge simply reduced the verdict to conform to the ad damnum clause in the complaint and, thus, failed to discharge its duty under Hodges. Although there was a discussion between the trial court and counsel about whether the ad damnum clause constituted the upper limit of the allowable award, the trial court conducted, pursuant to Hodges, an extensive and probing review of the award after this discussion. The Court stated:

> Well, I think I'm required under Hodges v. Toof to review the award and give consideration to the matters in which the jury was required to have been instructed, and I need to set forth the reasons for the punitive award.
>
> ...
>
> The court recognizes that the net worth of Fayette Tubular is over $35,000,000. That's the amount that was stipulated by the attorneys ... The factors that the jury considered were, number one, the defendant's financial affairs, financial condition, and net worth. And all we had was the net worth, and as I indicated that was over $35,000,000.

7

Factor number two was the nature and reprehensibility of the defendant's wrongdoing. That is the impact of the defendant's conduct on the plaintiff. The defendant removed plaintiff for a period of time from her livelihood. She had a great deal of trouble seeking and finding other employment, and went to a number of places before she was finally hired at Berkline. She had never been fired from a job before she was fired from her job by the defendant company and the impact on the plaintiff, based on the way plaintiff testified ... the court was of the opinion that this had a devastating impact on her.

...

Factor number three was the defendant's awareness of the amount of harm being caused, and the defendant's motivation in causing the harm. It's apparent to me that Fayette Tubular employees were aware that this was causing the plaintiff a great deal of difficulty. They were there and contested her employment benefits claim, and they recognized from her conversations that the plaintiff had with the defendant's employees, that this was causing harm to the plaintiff and to her ability to make a living.

Factor number four was the duration of the defendant's misconduct and whether the defendant attempted to conceal the conduct. Well, the duration of the misconduct continued right on through the date of the trial. The defendant had taken action only when it was forced to take action. The defendant denied all of the statements of the plaintiff right on through the entire proceeding, and up until the Employment Security hearing indicated that the plaintiff was going to receive unemployment security. It wasn't until then that the defendant made an offer of reinstatement.

Factor number five was the expense plaintiff has borne in attempting to recover the losses ... This has been a protracted and very complicated proceeding and litigation ... and I'm confident that the plaintiff is expending some considerable resources to have this case heard.

Factor number six is whether the defendant profited from the activity, and if the defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior. The profit on the part of the defendant is not clear on the record. But the court is of the opinion that the punitive award should be significant so as to deter similar future behavior both on the part of the defendant, and on the part of others who might attempt to do to the plaintiff what has been done in this case.

Factor number seven is whether once the misconduct became known to the defendant, the defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm

caused. The defendant offered reinstatement with back pay, but the reinstatement offer was one that plaintiff felt that she could not accept and the amount of back pay was not sufficient. The defendant has tried to convince the jury and the court that this offer of reinstatement and back pay was sufficient ... [The defendant] obviously did not convince the jury, and I would announce that they did not convince the court ... The court certainly wasn't surprised that she rejected the offer, and didn't even respond to that offer, because it was so insufficient on its face.

The defendant was not prompt in making this offer of reinstatement. The defendant delayed until after the employment security decision was handed down, some several months, quite possibly up to a year later. Then and only then did the defendant scramble to try to stop the damage, not to the plaintiff, but the apparent damage that was about to be caused to the defendant, and then make this offer of reinstatement which was only one half of the back wages.

Factor number eight is any other circumstances shown by the evidence that bear on the proper amount of the punitive award. The court, in listening to the testimony in this case, finds the plaintiff to be a very credible witness. Conversely the court is not persuaded by the testimony of the employees of the defendant, and the entire circumstances indicate that there should be a significant amount of punitive award in this case ...

Taking all of this into consideration, this court is of the opinion that the punitive damage award is appropriate ... In terms of the amount, the court having made the findings of fact in regard to the eight factors that were considered in this case, the court is of the opinion that the punitive award in this case should be set in the amount of $500,000, and the court so orders.

Furthermore, the defendant argued in its Rule 59 motion that the punitive damages award of $1,500,000 was 50 times the amount of back wage award, ($30,000), and was thus violative of Hodges. The trial court rejected this argument, and in so doing made it perfectly clear that the reduction of the award was not based on the ad damnum clause, but rather on the Hodges factors. The court stated:

We had a discussion about whether or not the [plaintiff's recovery was limited to the ad damnum.] But I don't want to leave the impression

9

that I've reduced the amount from $1,500,000 to $500,000 just because of what the plaintiff's ad damnum was. My decision was based exclusively on the factors that I am to consider when making that determination. And it was my opinion that $500,000 was the appropriate amount of punitive damages that should be awarded in this case under the factors that I was to consider, and that I did consider. It just so happened that the plaintiff's ad damnum was at $500,000, but those are two independent situations. I didn't reduce it just because that what the plaintiff had sued for.

Having determined that the trial court did conduct a review as required by Hodges, and that its reduction of the award was intended as a remittitur, we next consider whether the Court of Appeals was justified in further remitting the award. In order to resolve this issue, we must examine the trial court's authority to suggest a remittitur, and the appellate court's authority to review this decision.

It is now well-settled that trial judges may suggest adjustments when the jury verdict is within the range of reasonableness of the credible proof as an alternative to the practice of granting a new trial if they are of the opinion that the jury verdict "[i]s not adequate" (suggesting additur) or excessive and "should be reduced" (suggesting remittitur). Tenn. Code Ann. § 20-10-101 and 102, Foster v. Amcon Int'l., Inc., 621 S.W.2d 142, 147 (Tenn. 1981).[1]

Appellate courts also have the authority to suggest a remittitur although this authority is naturally more circumscribed than that possessed by the trial courts. Tenn. Code Ann. § 20-10-102(b) provides that if the trial court suggests a remittitur,

---

[1] Foster actually dealt with the trial court's authority to suggest an additur, but the standards governing an additur and remittitur are analogous. Foster, 621 S.W.2d at 143 n. 2.

the Court of Appeals shall review that judgment using the standard of review applicable to decisions of trial courts sitting without a jury. See also Thrailkill v. Patterson, 879 S.W.2d 836, 841 (Tenn. 1994). This standard is set forth in Tenn. R. App. P. 13(d), which provides in pertinent part:

> Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of correctness of the finding, unless the preponderance of the evidence is otherwise. . . .[2]

After reviewing the record, we cannot say that a preponderance of the evidence is contrary to the trial court's findings. The weight of the evidence seems to indicate that Coffey was fired, for a pretextual reason, after she attempted to enforce her worker's compensation rights. It is also clear that the defendant did nothing to remedy the situation until the unfavorable decision of the Board of Employment Security demanded that some sort of action be taken. Additionally, we note that there is another "aggravating" factor that the trial court did not discuss. At trial two former Fayette Tubular employees testified that they had been fired after attempting to enforce rights under the Worker's Compensation Act. Thus, there is evidence that Coffey's termination was not an isolated incident, but that the

---

[2]

If, however, the jury verdict is approved by the trial court in its role as "thirteenth juror," (deals with consent of party to additur) the standard of review to be utilized by the Court of Appeals is more deferential: in that case, the appellate court must affirm if there is any material evidence to support the verdict. Ellis v. White Freightliner Corp., 603 S.W.2d 125, 129 (Tenn. 1980); Benson v. Tennessee Valley Elec. Co-op., 868 S.W.2d 630, 640 (Tenn. App. 1993). This deferential standard of review is consonant with the principle, long recognized in Tennessee law, that the jury bears primary responsibility for awarding damages in a personal injury case, followed closely by the trial court in its role as thirteenth juror. See e.g., Foster, 621 S.W.2d at 143-44 n.3.

11

defendant pursued a policy of terminating employees for this illegal purpose; we think a fact finder may legitimately impose a greater amount of punitive damages upon a defendant guilty of such conduct. Taking all these factors into consideration, we conclude that the award of $500,000, 1.5% of Fayette Tubular's net worth, is rational in light of the dual purposes of punitive damages: punishment and deterrence. Therefore, the judgment of the Court of Appeals on this ground is reversed, and the judgment of the trial court reinstated.

<u>II</u>.

The next issue for our consideration is whether the Court of Appeals erred in vacating the $20,000 in "front pay" awarded by the trial court. This issue requires us first to discuss the remedies available to a plaintiff who has been discharged from employment for an illegal reason.

In these cases, courts are invariably faced with two issues: (1) how to compensate a plaintiff for past injuries -- those occurring between the date of the discharge and the date of trial; and (2) how to compensate for future injuries -- those occurring after the trial. The first issue is straightforward: the court simply awards the plaintiff "back pay," the amount he or she would have earned during the period between the discharge and the trial. <u>Sasser v. Averitt Express, Inc</u>., 839 S.W.2d 422, 433 (Tenn. App. 1992). The issue of future damages is, however, more problematic. While virtually all courts agree that the clearest way to make the plaintiff whole is to supplement the back pay award with reinstatement to the job, <u>Wilson v. S & L Acquisition Co. L.P</u>., 940 F.2d 1429, 1438 (11th Cir. 1990); <u>Spulak v. K-Mart Corp</u>.,

12

894 F.2d 1150, 1157 (10th Cir. 1990), courts have also realized that reinstatement is not feasible in some situations. Perhaps the most common circumstance rendering reinstatement infeasible is "where the employer has demonstrated such extreme hostility that, as a practical matter, a productive and amicable working relationship would be impossible ..." Sasser, 839 S.W.2d at 433 (citations omitted).

Where reinstatement is not feasible, the court may order front pay -- a monetary award intended to compensate the plaintiff for the loss of future earnings. Because of its prospective nature, front pay is inherently speculative. In order to limit this speculativeness, courts have applied the following factors, which were set forth by our Court of Appeals in Sasser:

> (1) the employee's future in his or her old job [meaning an estimation of what the employee could have earned in the old job if the discharge had not taken place]; (2) the employee's work and life expectancy; (3) the employee's obligation to mitigate his or her damages; (4) the availability of comparable employment opportunities and the time reasonably required to find another job; and (5) the amount of any award for liquidated or punitive damages.

Sasser, 839 S.W.2d at 434 (emphasis added) (citation omitted).

In the case before us, the trial court found that reinstatement was not feasible due to the animosity exhibited by Fayette Tubular towards Coffey. After conducting a review of the factors enunciated in Sasser, it awarded $20,000 in front pay. The Court of Appeals, however, reversed this aspect of the judgment, relying upon factor five (5) of the Sasser decision. It reasoned that: "in view of the punitive damage award, even when reduced by the suggested remittitur, the award of front pay is inappropriate. In other words, the anticipated loss of future earnings is more than

13

compensated by the punitive damage award which is not based upon any particular loss by plaintiff."

Coffey argues that punitive damages are not intended to compensate the plaintiff for harm suffered but are designed to punish the defendant and deter it from engaging in similar conduct in the future. Because punitive damages are unrelated to the amount of compensation the plaintiff is entitled to receive, she argues that it was inappropriate for the Court of Appeals to consider the amount of the punitive award when determining the defendant's liability for front pay.

We first note that of the few courts that have considered this issue, perhaps a majority have concluded that the trial court must consider any existing award of liquidated or punitive damages in making its determination of front pay and that a substantial award may render front pay inappropriate or excessive. Walther v. Lone Star Gas Co., 952 F.2d 119, 127 (5th Cir. 1992); Tennes v. Massachusetts Dep't of Revenue, 944 F.2d 372, 381 (7th Cir. 1991); Wildman v. Lerner Stores Corp., 771 F.2d 605, 616 (1st Cir. 1985).[3] These courts generally support this conclusion by arguing that front pay is an inherently speculative remedy and that if the punitive award is not taken into account in setting the amount, the plaintiff could receive a windfall.

After careful consideration, however, we, along with at least one other court,

_____

[3] These cases all arose under the Age Discrimination in Employment Act. Under that act, if the jury finds the illegal age-based discharge to be "willful," it may award "liquidated" damages, which are intended to be punitive. Wheeler v. McKinley Enters., 937 F.2d 1158, 1159 (11th Cir. 1991).

14

see Newhouse v. McCormick & Co., 910 F.Supp. 1451, 1459 (D. Neb. 1996), reject this position. The first major problem with the "majority" rule is that it turns the proper relationship between compensatory and punitive damages on its head. Normally, the reasonableness of a punitive award is tested by its relationship to the harm suffered by the plaintiff. See BMW of North America, Inc. v. Gore, 64 U.S.L.W. 4335, 4341-42 (U.S. 1996); TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct.2711, 125 L.Ed.2d 366 (1993); Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). However, the reverse is not true: the reasonableness of a compensatory award, the jury's valuation of the plaintiff's harm, is never tested by its relationship to the punitive award. This is because the defendant's actions may have been relatively blameless and worthy of little or no punitive response from the jury, and yet the plaintiff may have suffered a large amount of economic damages; on the other hand, the defendant's actions may have been particularly egregious and worthy of a substantial punitive response, yet the plaintiff may have suffered only a small amount of economic damages. See Gore, 64 U.S.L.W. at 4342 ("Indeed, low awards of compensatory damages may properly support a higher ratio [of punitive to compensatory damages] than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages.") By making the determination of front pay, which has no necessary relationship at all to the punitive award, dependent upon that award, the majority rule violates the normal, rational relationship between compensatory and punitive damages. Its invocation in setting front pay is therefore arbitrary and irrational.

Nor is this flaw overcome by the argument concerning the speculativeness of

15

front pay and the possibility of the plaintiff obtaining a windfall. The answer to this argument is that the speculative nature of the front pay remedy carries just as much potential to shortchange the plaintiff as it does to grant it a windfall. The speculativeness of the remedy is a double-edged sword and is not cured by a mechanism that only allows adjustment in one direction.

Because we conclude that the determination of front pay cannot be based on the punitive award, we reverse the Court of Appeals' judgment in that respect and reinstate the judgment of the trial court.

_____
FRANK F. DROWOTA III
JUSTICE

Concur:

Birch, C. J.
Anderson, Reid, White, JJ.

16