Floyd Randall CASSIDY, Plaintiff,

v.

SPECTRUM RENTS, Defendant.

No. 3:96–CV–41.

United States District Court,
E.D. Tennessee.

Jan. 29, 1997.

David A. Burkhalter, II, Knoxville, TN, for plaintiff/counter–defendant.

G. Gerard Jabaley, Knoxville, TN, James P. Wilkins, Jeffrey J. Weber, Cleveland, OH, for defendant/cross–plaintiff.

### MEMORANDUM AND ORDER

PHILLIPS, United States Magistrate Judge.

Defendant has moved this court pursuant to Fed.R.Civ.P. 50 and 59 for judgment notwithstanding the verdict, or in the alternative, for alteration or amendment of the judgment, a new trial, or a remittitur [Doc. 53]. Plaintiff has responded [Doc. 56].

The jury in this matter awarded plaintiff $70,000.00 for compensatory damages and $250,000.00 for punitive damages. Additionally, the jury indicated that plaintiff was to receive the cost of his legal fees [Doc. 52].

Rule 50 of the Federal Rules of Civil Procedure provides in part as follows:

(a) Judgment as a Matter of Law.

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial. If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

(1) if a verdict was returned:

(A) allow the judgment to stand,

(B) order a new trial, or

(C) direct entry of judgment as a matter of law; or

(2) if no verdict was returned;

(A) order a new trial, or

(B) direct entry of judgment as a matter of law.

The judgment notwithstanding the verdict has been amalgamated into a Rule 50 motion for judgment as a matter of law. See Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 583 (6th Cir.1994). The court must distinguish between a Rule 50(b) motion based on a challenge to the facts as found by the jury and those based on purely legal grounds, which take the jury's findings at face value. The two types of challenges are reviewed differently. In a Rule 50(b) motion based on the sufficiency of the evidence sup-

porting a jury's findings, the court, when sitting in diversity, must use the standards of review applicable under the law of the forum state. *K & T Enterprises., Inc. v. Zurich Ins. Co.,* 97 F.3d 171, 175–76 (6th Cir.1996). Under the appropriate standard of review, this court should take the strongest legitimate view of the evidence in the plaintiff's favor and resolve all reasonable inferences in his favor. If there is material evidence in the record that supports the verdict for the plaintiff, it must be sustained. *See Cecil v. Hardin,* 575 S.W.2d 268 (Tenn.1978).

### PUNITIVE DAMAGES AVAILABLE?

Defendant contends that plaintiff has failed to produce sufficient evidence for a jury to conclude, by clear and convincing evidence, that defendant's conduct was so egregious as to support an award of punitive damages under Tennessee law.

Prior to *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896 (Tenn.1992), punitive damages were available in cases involving fraud, malice, gross negligence, oppression, wrongful acts done with a bad motive or so recklessly as to imply a disregard of social obligations, or where willful misconduct or an entire want of care raised a presumption of conscious indifference to the consequences. *Inland Container Corp. v. March,* 529 S.W.2d 43, 45 (Tenn.1975).

■■■ Since the *Hodges* decision, however, a court may award punitive damages only if it finds, by clear and convincing evidence, that a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly. 833 S.W.2d at 901. The *Hodges* court gave definitions to these various terms:

A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result ... [a] person acts fraudulently when (1) the person intentionally misrepresents an existing material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation ... [a] person acts maliciously when the person is motivated by ill will, hatred, or personal spite ... [a] person acts recklessly when

the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

*Id.* at 901 (citations omitted). Clear and convincing evidence means that there can be no serious doubt about the correctness of the conclusions drawn from the evidence. Id. at 901, n. 3.

■■■*The Hodges* case signified that "Tennessee clearly join[ed] a growing doctrinal trend away from the liberal imposition of punitive damage awards." *Vogt v. Emerson Electric Co.,* 805 F.Supp. 506, 511 (M.D.Tenn. 1992). Punitive damages are to be awarded only "for the purposes of punishing wrongdoers and deterring them from similar conduct in the future." *Coffey v. Fayette Tubular Products,* 929 S.W.2d 326 (Tenn.1996). The Tennessee Supreme Court has indicated that punitive damages should be applied only in those cases involving "the most egregious of wrongs." *Hodges,* 833 S.W.2d at 901.

■■■ Under *Hodges,* the jury makes the initial determination as to whether punitive damages are justified, and, in a separate hearing, later determines the amount of the award. During the second phase, the fact finder considers the following:

(1) The defendant's financial affairs, financial condition, and net worth;

(2) The nature and reprehensibility of defendant's wrongdoing, for example

(A) The impact of defendant's conduct on the plaintiff, or

(B) The relationship of defendant to plaintiff;

(3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;

(4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

(5) The expense plaintiff has borne in the attempt to recover the losses;

(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess

of the profit in order to deter similar future behavior;

(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Hodges,* 833 S.W.2d at 901–02.

■ As a safeguard against unwarranted and excessive punitive damages, the trial court then must review the jury's award of punitive damages. The trial judge is to clearly set forth the reasons for decreasing or approving the punitive award in findings of fact and conclusions of law demonstrating a consideration of all the factors on which the jury has been instructed. *Hodges,* 833 S.W.2d at 902.

Defendant primarily claims that the circumstances of this case do not fall within the category of the "most egregious of wrongs." Defendant states that the application of the *Hodges* standard in the employment context is particularly difficult, since the gravamen of an unlawful discharge claim is that the employer intentionally discharged the employee for a reason forbidden by law and a literal application of the "intentionally" standard would lead to the mistaken result that a prevailing plaintiff is always entitled to punitive damages. Defendant contends that this result is not in keeping with the admonition in *Hodges* that punitive damages be reserved only for "the most egregious of wrongs" [Doc. 53].

Defendant posits that plaintiff's theory of this case was that, because plaintiff sought workers' compensation benefits, Greg Moore, the store manager, fed Larry Hendricks, Mr. Moore's supervisor, "bad facts," which induced Mr. Hendricks to make the decision to discharge plaintiff. Defendant concludes that the jury apparently determined that Mr. Hendricks based his decision on the information provided by Mr. Moore, and that plaintiff's workers' compensation claim was therefore a "substantial factor" in plaintiffs termination.[1] Defendant claims, however, that "misplaced faith" in his store manager by Mr. Hendricks does not constitute the "most egregious of wrongs" for which an award of punitive damages would be proper. According to defendant, in particular, plaintiff presented no "clear and convincing" evidence that Mr. Hendricks knew of the plaintiff's workplace injury prior to plaintiff's termination. Defendant argues, therefore, that based on what Mr. Hendricks knew, his actions were not malicious or fraudulent [Doc. 53].

Defendant further contends that once Mr. Hendricks was informed by telephone by plaintiff of plaintiff's workplace injury, Mr. Hendricks' actions were in full compliance with defendant's obligations under the applicable workers' compensation laws, as Mr. Hendricks told plaintiff to go to the store and get whatever forms he needed to take care of his injury. Defendant also argues that its actions with respect to the processing and payment of plaintiff's subsequent workers' compensation claim were in complete accord with the law [Doc. 53].

In response, plaintiff argues that the jury was properly and correctly instructed pursuant to *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896 (Tenn.1992), a bifurcated trial was allowed, and the jury returned its verdict. Plaintiff claims there is material evidence to support the jury's verdict, and therefore, its assessment of punitive damages should be upheld [Doc. 56].

At the trial, defendant asserted that neither Mr. Hendricks nor Mr. Moore had knowledge of the plaintiff's injury or request for workers' compensation prior to the plaintiff's termination.

Plaintiff asserts that shortly after receiving the back injury, he felt immediate pain

---

1. Plaintiff contends that Mr. Moore's yearly bonus is affected if workers' compensation claims are too numerous [See Defendant's Ex. I].

and reported it to Mr. Moore that same day. According to plaintiff, Mr. Moore told him that the injury was probably a pulled muscle and for him to get back to work. Plaintiff contends that his back injury was quite noticeable. He notes that former co-worker James Wyatt testified at trial that he had noticed the injury and had commented that plaintiff acted like he had "ants in his pants," to which plaintiff had replied that he had gotten injured while making a delivery [Doc. 56].

After giving notice of his on-the-job injury, plaintiff claims he had several discussions with Mr. Moore in an effort to complete the necessary workers' compensation forms. According to plaintiff, Mr. Moore was stubborn, resistant, hostile, and threatening toward him regarding the issue of workers' compensation. Plaintiff states that while the proof showed that Mr. Moore had the proper forms in Knoxville, Mr. Moore denied having the requisite paperwork at the office. Plaintiff claims that after he had given notice of his injury and began requesting workers' compensation, Mr. Moore began talking about plaintiff's possible termination. Plaintiff asserts that he was informed by Mr. Moore that the next person who asked for time off or for workers' compensation would be fired. Former co-worker Darrell Collins corroborated this testimony by testifying, without objection, that he had heard this type of discussion repeated. Further, according to plaintiff, Mr. Moore explained to him that he would be fired if he persisted in his request for workers' compensation, since Mr. Moore "worked hurt everyday" and he "wasn't going to let people lay across the couch and watch Oprah on his time."

A few days before his termination, plaintiff claims Mr. Moore instructed him to use his health insurance card to obtain treatment in lieu of workers' compensation. Plaintiff contends that he followed Mr. Moore's instructions and, on April 18, 1995, his day off, utilized his health insurance card to see a doctor. The emergency room records, dated prior to plaintiff's termination, indicate that plaintiff gave the history of sustaining a back injury while moving a couch [Ex. 6]. According to plaintiff, when he agreed to use his health insurance card to get treatment, he was told what a good job he was doing and how glad Mr. Moore was to have him working inside the store with him [Doc. 56].

Plaintiff claims that when he went to the emergency room, however, he learned he would need further treatment that would have to be handled under workers' compensation. Plaintiff states that when he reported to work the next day, he again requested workers' compensation from Mr. Moore in order to get this treatment and showed Mr. Moore a medical excuse, but that Mr. Moore fired him. Plaintiff contends that he showed Mr. Moore the excuse immediately before he was fired. Mr. Moore admitted he saw this excuse the day plaintiff was fired. He testified that he was not aware that the health plan would not cover an on-the-job injury.

According to plaintiff, he was told he was being fired due to "chemistry." However, defendant's contemporaneously prepared termination documentation placed in plaintiff's "Employee Record File" indicates the reason for plaintiff's termination as "performance" [Ex. 9]. Other documents prepared by defendant at the time also reflect plaintiff was fired for "performance." At the trial, defendant presented evidence of two shortages and a missing stereo and argued that plaintiff was fired due to "suspicion of theft." Plaintiff states that the proof shows that there had been shortages at the store prior to plaintiff being hired and that shortages occurred at the store after plaintiff was fired. Plaintiff advances that Mr. Moore's bonus in April 1995, for example, had been docked in connection with an earlier unrelated shortage [See Ex. 103], and that Mr. Moore had a motive to cast blame in connection with a shortage, since the shortage would not come out of his bonus if there was a "suspect" [Exs. 101 and 102]. Plaintiff emphasizes that despite allegations of three separate "thefts" that allegedly occurred in a short time period, the police were never called and no police report was ever filed by defendant. Additionally, plaintiff notes that the proof shows that other employees had opportunity and/or motive to commit the thefts and that no evidence tied him to any of the thefts [Doc. 56]. The evidence reveals that plaintiff vehe-

mently denied he stole anything and offered to take a lie detector test, while Mr. Moore admitted he had other "suspects" and that he never saw plaintiff take anything nor did anyone else.

After being fired, plaintiff telephoned Mr. Hendricks that same day. Plaintiff states that after a brief discussion, he mentioned his back injury and that he needed "workers' compensation." At trial, Mr. Hendricks initially denied that plaintiff requested workers' compensation in this particular conversation, but Mr. Hendricks had stated in his deposition testimony that plaintiff did discuss workers' compensation at that time. Defendant emphasizes that plaintiff was told at this point to go ahead and contact Mr. Moore and get the workers' compensation claim forms. However, while Mr. Hendricks claims that he knew nothing of the injury nor the workers' compensation claim, Mr. Hendricks testified that he did not ask plaintiff any questions about how or when plaintiff became injured. Mr. Hendricks also testified that when he told Mr. Moore to give the workers' compensation claim forms to plaintiff, he did not ask Moore any questions and Mr. Moore did not ask him any questions about how, when or under what circumstances plaintiff was hurt.

■ Following plaintiff's termination, it appears plaintiff received a letter of recommendation from Mr. Moore. Plaintiff asserts that he did not request the letter, which stated in part:

Mr. Cassidy leaves our company in good standing and I would recommend him for hire.

Ex. 15.

The testimony and the documentary evidence, in the light most favorable to plaintiff, establish that defendant had knowledge of plaintiff's on-the-job injury and the workers' compensation request. The termination documents indicate plaintiff advised Mr. Moore of the injury on April 5, 1995. Defendant's own documents, such as the Employer's First Report of Work Injury, which defendant prepared on May 23, 1993, and which defendant subsequently filed with the State of Tennessee, admitted as follows:

*Date employee gave notice of injury if different from date of injury, 4/5/95.*

Ex. 19. The claim form submitted to Aetna by defendant noted under the caption, "caller's name," "Greg Moore," and stated: *"Date Claim Reported to Employer: April 5.1995"* [Ex. 119]. Also, defendant received a letter back from Aetna dated May 30, 1995, which asked defendant to verify the information contained therein "to insure accuracy," and this stated:

*Date Reported to Employer 04/05/95.*

Ex. 22. The Employer's First Report of Injury, the claim form it submitted to Aetna, and the acknowledgement received back from Aetna, constitute clear and convincing evidence that defendant's agents and employees had knowledge of plaintiff's injury and workers' compensation claim prior to his termination. Clear and convincing evidence that defendant acted "intentionally, fraudulently, or maliciously" can be inferred from these documents indicating knowledge when defendant claimed it had no knowledge.

This evidence, when added to the letter of recommendation and the fact that, although they claimed no knowledge of plaintiff's injury and claim, no questions were asked by either Mr. Hendricks or Mr. Moore regarding plaintiff's situation, conflicts with contentions by defendant that plaintiff was fired solely because he was suspected of being a thief. Reviewing the record in the light most favorable to plaintiff, the evidence presented at the trial revealed that other employees (and/or non-employees) were just as likely (or more likely) as plaintiff to have been involved in the thefts. Apparently there were shortages before plaintiff was hired and after he was fired. Moreover, plaintiff was never observed taking anything, and Mr. Moore admitted he had other suspects. Plaintiff denied the thefts, offered to take a lie detector test and the police were never called. Also, the letter of recommendation would tend to negate suspicion of theft as a reason.

As far as plaintiff's "performance," the reason listed for plaintiff's termination on the termination documentation, the letter of recommendation would also tend to refute this notion as the true reason for plaintiff's firing.

As to "chemistry," the witnesses who testified, including Mr. Moore, said they liked plaintiff and that they got along fine with him. The testimony established that plaintiff was a hard worker, that he got along well with customers and, in fact, had received raises and a promotion while employed by defendant.

In its discretion, the trier of fact may award punitive damages in proper cases. *See Coakley v. Daniels*, 840 S.W.2d 367, 372 (Tenn.App.1992). In the opinion of the undersigned, a reasonable jury could find clear and convincing evidence that defendant acted in an intentional, fraudulent and/or malicious manner in retaliation against plaintiff for asserting his rights to workers' compensation. Accordingly, such conduct would justify and support an award of punitive damages.

### AMOUNT OF PUNITIVE AWARD

Defendant argues that even if punitive damages are justified, the amount awarded by the jury is grossly excessive. Defendant contends that the court should suggest a remittitur in the amount of damages [Doc. 53]. In response, plaintiff submits that the amount of punitive damages assessed by the jury was appropriate and should not be disturbed [Doc. 56].

Under *Hodges*, this Court must evaluate the jury's punitive damage award in light of the following non-exclusive list of factors that should have been considered by the jury:

(1) The defendant's financial affairs, financial condition, and net worth;

(2) The nature and reprehensibility of defendant's wrongdoing, for example

(A) The impact of defendant's conduct on the plaintiff, or

(B) The relationship of defendant to plaintiff;

(3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;

(4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

(5) The expense plaintiff has borne in the attempt to recover the loss;

(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based on the same wrongful acts;

(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive damage award.

*Hodges*, 833 S.W.2d at 901–902.

In Tennessee, the trial judge may suggest adjustments when the jury verdict is within the range of reasonableness on the credible proof as an alternative to the practice of granting a new trial if they are of the opinion that the jury verdict "[i]s not adequate" (suggesting additur) or excessive and "should be reduced" (suggesting remittitur). Tenn.Code Ann. §§ 20–10–101 and 102; *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142, 147 (Tenn.1981). However, the amount to be awarded as punitive damages rests largely in the discretion of the trier of fact. *Coakley v. Daniels*, 840 S.W.2d 367, 372 (Tenn.App. 1992).

Defendant argues that the amount of the punitive damages award is clearly excessive when compared to defendant's net worth. Defendant relies on *Coffey v. Fayette Tubular Products*, 929 S.W.2d 326 (Tenn.1996), another retaliatory discharge case, wherein the defendant had a net worth of over $35 million. In that case, the court found that a punitive damage award of $500,000—representing approximately 1.5 % of the employer's net worth—was a reasonable award, specifically noting that the employer had a policy of discriminating against employees who filed workers' compensation claims. *Id.* Defendant argues that in this case, in that defendant's company has a net worth of only $9.1 million, the punitive damages award of $250,000 represents an award of nearly 2.75

percent of defendant's net worth, nearly double the 1.5 percent awarded in *Coffey.*

Defendant contends the award is particularly excessive because, unlike the employer in *Coffey,* defendant did not have the aggravating factor of a "policy" of discriminating against individuals who filed workers' compensation claims. Defendant states that it was undisputed during the trial that none of the numerous other employees of defendant who have filed workers' compensation claims both before and after plaintiff filed his claim, have alleged that they suffered any retaliation. Defendant argues that plaintiff offered no evidence of any other instance involving even an allegation of workers' compensation retaliation, and that the evidence demonstrates that defendant's "policy" was not to retaliate against employees who file workers' compensation claims. Defendant claims the jury's verdict regarding plaintiff's discharge addressed what was, at most, "a one-time aberration" from defendant's policy of non-retaliation [Doc. 53].

Defendant further argues that plaintiff's counsel's assertion that defendant selected plaintiff for retaliation because his injury was more severe than those incurred by other employees is completely unsupported by the record. Defendant notes that the doctor's note presented by plaintiff to Mr. Moore on April 19 stated only that plaintiff needed bed rest for two or three days, and that he should perform no lifting for ten days. According to defendant, considering the relatively minor restrictions contained in this note, and the fact that plaintiff had continued to work even after suffering this injury on April 5, defendant had no way of knowing at the time of plaintiff's discharge that his injury was unusually severe, or that it would ultimately require surgery several months later [Doc. 53].

Defendant also contends that punitive damages are not required in this case in order to deter future misconduct by defendant. *See Coffey v. Fayette Tubular Products,* 929 S.W.2d 326 (Tenn.1996) (punitive damages are "for the purposes of punishing wrongdoers and deterring them from similar conduct in the future"). Defendant repeats that numerous workers' compensation claims have been filed by various employees since plaintiff's termination, and there is no evidence that any of those individuals have been subject to retaliation. Additionally, defendant claims that the fact that other employees at the same store have applied for and received such benefits since plaintiff's termination confirms that plaintiff's discharge has not had a "chilling effect" on employees who are injured at the workplace [Doc. 53].

Defendant also contends that it has incurred significant costs rather than "profited" from plaintiff's termination. Defendant urges consideration of the fact that it extended plaintiff's medical coverage for an additional month and a half and gave him several days of additional pay [Doc. 53]. Defendant states that it did not save any money by discharging plaintiff, because it was still paying benefits to him even though he was performing no work, and defendant was also having to pay the individual who replaced plaintiff.

Defendant also argues plaintiff suffered no harm due to his discharge. Plaintiff conceded that he was unable to work because of his back injury until August 1995. Defendant contends this inability to work would have occurred regardless of whether or not plaintiff had been discharged. Defendant notes that it did not oppose plaintiff's workers' compensation claim, and correctly assumed that he was receiving workers' compensation benefits following his discharge. Moreover, plaintiff had received a workers' compensation lump sum settlement of over $41,000 in October 1995. Defendant argues that it cannot be said that defendant was consciously indifferent to the plaintiff's plight because, to the best of defendant's knowledge, plaintiff had received significant compensation from workers' compensation that should have ameliorated any financial difficulties [Doc 53].

Defendant submits that at most, the evidence may show that Mr. Hendricks should not have relied on the recommendation of Mr. Moore when making his decision to terminate plaintiff. However, defendant contends that while Mr. Hendricks' reliance on Mr. Moore's "facts" may justify a finding of liability, it hardly amounts to the type of

conduct for which excessive punitive damages are justified [Doc. 53].

According to plaintiff, the amount awarded was within a reasonable range and this court should not second guess the jury. Plaintiff notes that Tennessee courts have approved other punitive damages awards when much less compensatory damages were awarded. *See Coffey v. Fayette Tubular Products,* 929 S.W.2d 326 (Tenn.1996); *Headrick v. Carter,* 897 S.W.2d 256 (Tenn.1995); *Boling v. Tennessee State Bank,* 890 S.W.2d 32 (Tenn. 1994).

Further, plaintiff claims that the defendant's 1995 financial records reveal total revenues of $43,461,391.00, total assets of $20,603,170.00, income before taxes of $2,640,495.00, retained earnings of $2,502,-374.00 and total shareholder's equity of $9,118,879.00. Thus, plaintiff submits that defendant has substantial assets and that the amount of punitive damages awarded by the jury is not excessive when compared with the assets and income.

■■■ I have considered the factors as noted in *Hodges.* Of the factors I found applicable, I conclude that the award was not excessive in comparison to the financial condition of defendant as established by the evidence. The psychological testimony established that defendant's conduct had a severe impact on the plaintiff, revealing that plaintiff sustained "major depression" as a result of his discharge. The psychologist confirmed that plaintiff is still bothered by this incident. Considering the factors of the duration of defendant's misconduct and the attempt to conceal, the court finds it incredible that defendant would continue to posit that it had no notice of plaintiff's injury or claim in light of the documentation supporting the contrary. A reasonable jury could conclude that the defendant's motivation for discharging plaintiff was to increase its profits by reducing or maintaining its workers' compensation insurance premiums and/or increasing bonus amounts for the manager and that defendant has attempted to conceal its motives by claiming plaintiff was discharged because of "suspicions of theft." That plaintiff did not "create" the on-the-job injury merely to get back at his employer is apparent by his report to the hospital worker, *before* he was fired and while seeking treatment with his insurance card, that he was injured while lifting a couch. The undersigned further finds a significant factor to be that defendant did not process the workers' compensation forms until after plaintiff retained an attorney. Based on these findings, this court will not second guess the jury. The jury was properly instructed on what factors to consider in determining punitive damages. Accordingly, the amount of the award is approved.

### AWARD OF LEGAL FEES BY JURY

The court's judgment entry of December 5, 1995, awards plaintiff the "cost of legal fees." Defendants argue that the award of legal fees is not in accordance with Tennessee law, which bars an award of attorneys' fees absent explicit contractual or statutory authorization [Doc. 53].

■■■ "In the absence of a statutory or contractual agreement between the parties, allowance of attorney fees as part of damages recoverable is contrary to the public policy of the state." *John J. Heirigs Const. Co., Inc. v. Exide,* 709 S.W.2d 604, 609 (Tenn.App. 1986), *citing Thayer v. Wright Co.,* 50 Tenn. App. 515, 362 S.W.2d 805 (1961) and *Stringfield v. Hirsch,* 94 Tenn. 425, 29 S.W. 609 (1895). Defendant notes that both this court and counsel for both parties recognized after the verdict that such damages were not recoverable. Plaintiff admits that the jury could not assess an award of legal fees in this case.

The award of legal fees by the jury will be removed from the judgment.

Defendant's motion for judgment nothwithstanding the verdict, or in the alternative, for alteration or amendment of the judgment, a new trial, or a remittitur [Doc. 53] is GRANTED IN PART in that the award of "legal fees" is not permitted and will be removed from the judgment; otherwise, the motion is DENIED IN PART as to the award of punitive damages and the amount.

**IT IS SO ORDERED.**