# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
July 20, 2011 Session

## AUNDREY MEALS, as Natural Parent, Guardian, and Next Friend of WILLIAM MEALS v. FORD MOTOR COMPANY

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-000254-03      Donna M. Fields, Judge**

---

**No. W2010-01493-COA-R3-CV - Filed April 13, 2012**

---

### PARTIAL DISSENT

---

I concur with most of the majority's thorough opinion. I must dissent from the majority's decision to suggest a remittitur of the jury verdict, from a total $43.8 million to $12.9 million. Respectfully, nothing in the majority opinion states a basis under the law for such a remittitur. In the absence of a basis under the law for remittitur, I believe that the majority's decision amounts to a policy determination, limiting the size verdict a jury may award. It may be that our Legislature can appropriately make such a policy decision, but the courts are not authorized to do so.

The Plaintiff's economic damages are approximately $4.3 million, an amount that is undisputed on appeal. The jury's general verdict, then, includes a large award of approximately $39 million for non-economic damages.[1] The trial judge, having heard and considered all of the evidence at trial, approved the verdict. We must look, then, at whether this Court may suggest a remittitur of a verdict that was found by the trial judge, in her capacity as thirteenth juror, to be within the range of reasonableness and supported by the credible evidence at trial.

A trial judge "may suggest adjustments [additur or remittitur] when the jury verdict is within the range of reasonableness of the credible proof as an alternative to the practice of granting a new trial if [the trial judge is] of the opinion that the jury verdict . . . [is] excessive . . . ." *Coffee v. Fayette Tubular Products*, 929 S.W.2d 326, 330 (Tenn. 1996). While an appellate

---

[1]As noted by the majority, Ford is liable for only 15% of the total award under the jury's allocation of fault; however, our analysis must necessarily focus on the total damage award.

court is also authorized to suggest a remittitur, its authority to do so "is naturally more circumscribed than that possessed by the trial courts." *Id.* at 331. The Supreme Court in *Coffey* clarified the standard for the appellate court where the trial judge has approved the jury verdict:

> If . . . the jury verdict is approved by the trial court in its role as "thirteenth juror," . . . the standard of review to be utilized is more deferential: in that case, *the appellate court must affirm if there is any material evidence to support the verdict.* This deferential standard is consonant with the principle, long recognized in Tennessee law, that the jury bears primary responsibility for awarding damages in a personal injury case, followed closely by the trial court in its role as thirteenth juror.

*Id.* at 331 n.2 (emphasis added) (citations omitted). *See also Pomeroy v. I.C.R.R.*, No. W2004-01238-COA-R3-CV, 2005 WL 1217590, at *19 (Tenn. Ct. App. May 19, 2005). Therefore, in a case where the trial court has approved the verdict, we have no authority to suggest remittitur absent a finding by this Court that there is *no material evidence* in the record to support the award of non-economic damages.

Tennessee caselaw emphasizes how reluctant an appellate court should be to suggest a remittitur in the first instance, where the trial court has approved the jury's verdict. *See Riley v. Orr*, No. M2009-01215-COA-R3-CV, 2010 WL 2350475, at *9 (Tenn. Ct. Ap. June 11, 2010) (the appellate court must accord "great respect" to the trial court's approval of the damages awarded by the jury). This is especially true where the jury award at issue is for non-economic damages, as for pain and suffering and loss of enjoyment of life:

> [T]he determination on such non-pecuniary losses as pain and suffering damages involves a subjective element not present in the determination of ordinary facts. The jury trial guarantee requires that the subjective element involved be that of the community and not of judges . . . . When appellate courts are called upon to review a jury's award of non-economic damages, it is not their prerogative to determine whether the award strikes them as too high or too low.

*Smartt v. NHC Healthcare/McMinnville, LLC*, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at *21 (Tenn. Ct. App. Feb. 24, 2009) (*perm. app. den.* March 10, 2011) (citations omitted).

In sum, the standard for the appellate court to suggest remittitur as to a jury's award of non-pecuniary damages that has been approved by the trial judge is extraordinarily high. After

giving due deference to the jury's subjective judgment as to pain and suffering or loss of enjoyment of life, and after giving great respect to the trial court's approval of the jury's award, the appellate court may suggest remittitur in the first instance *only* if we find that the award of non-economic damages exceeds the uppermost boundary of the range of reasonableness under the evidence presented, *i.e.*, "the amount beyond which there is no evidence, upon any reasonable view of the case, to support the verdict." ***Ellis v. White Freightliner***, 603 S.W.2d 125, 126 (Tenn. 1980). If there is any material evidence to support the verdict, the appellate court "must affirm the judgment." ***Overstreet v. Shoney's, Inc.***, 4 S.W.3d 694, 718 (Tenn. Ct. App. 1999).

While the majority opinion recites the applicable standard, respectfully, its analysis gives little indication that the standard was followed. There is no finding of the upper boundary of the range of reasonableness based on the evidence in this case. There is no finding that there is no material evidence in the record to support the jury's award as approved by the trial court. Indeed, in the analysis in the majority opinion, there is no discussion at all of the evidence in the record on the Plaintiff's non-economic damages. The majority does not review the evidence on Billy's pain and suffering, loss of enjoyment of life and the like, and offers no explanation of how and why that evidence does not support the award.

Respectfully, the reasons given by the majority for the suggestion of remittitur do not justify it. The majority acknowledges that the jury's assessment of a modest 15% fault against Ford, with an equal assessment of fault against Billy's deceased father, indicates that the jury had no desire to punish Ford. It finds, however, that the size of the award combined with Ford's 15% fault "demonstrates sympathy and a desire to provide Billy full compensation for his economic damages in addition to his pain and suffering." It is always tempting after a jury trial to speculate about how the jury chose the amount of its award for non-pecuniary damages. An appellate court, however, must refrain from such speculation and instead base its decision on remittitur on an analysis of the evidence.

This Court has declined in the past to adopt a defendant's argument that the appellate court should infer the existence of passion, prejudice, or caprice solely from the size of a verdict. ***See Riley***, 2010 WL 2350475, at *7. Where the Court has suggested a remittitur as to a jury's award of compensatory damages, either pecuniary or non-pecuniary damages, this was done after explicit analysis of the evidence and a finding as to the upper limit of the range of reasonableness based on that evidence. ***Id.*** at *7 (remittitur suggested as to awards for future medical expenses and emotional injury).

The majority asserts that the jury's award in this case "is excessively high when compared to similar cases." However, in support of this statement, it cites only one case, ***Potter v. Fort Motor Co.***, 213 S.W.3d 264 (Tenn. Ct. App. 2006). In ***Potter***, the plaintiff was rendered

paralyzed after an automobile collision that caused her to "submarine" beneath her seat belt; the jury awarded compensatory damages in the amount of $10 million. Respectfully, the *Potter* case tells us nothing that is helpful to our analysis in this case. In *Potter*, the plaintiff was a 42-year-old woman, as opposed to a six-year-old child. The opinion does not tell us the amount of the plaintiff's economic damages, nor does it describe the evidence on her non-economic damages. Most important, remittitur was not even an issue, so the *Potter* Court did not consider whether the $10 million award was anywhere within the range of reasonableness considering the evidence presented in that case.

Research of Tennessee caselaw reveals numerous personal injury cases in which the appellate court has declined to suggest a remittitur, even though the jury's award of non-economic damages was many multiples of the proven economic damages. *See, e.g.,* ***Pomeroy***, 2005 WL 1217590, at *19 (economic damages of $41K, jury award of $500K); ***Riley***, 2010 WL 2350475, at *4, 7 (about $6K in economic damages, jury awarded non-economic damages totaling $158K); ***Vice v. Elmcroft of Hendersonville***, No. M2010-01148-COA-R3-CV, 2011 WL 3672048, at *16 (Tenn. Ct. App. Aug. 22, 2011) (economic damages of $3K, jury award of $250K); ***Smartt***, 2009 WL 482475, at *24-25 (economic damages totaling about $101K, appellate court declined to grant remittitur as to $3.9 million in non-economic damages). Two of these cases with a high proportion of non-economic damages even involved plaintiffs who were elderly. *See Vice*, *Smartt*.

As shown by the above cases, the proportion of non-economic damages to economic damages awarded in this case is not inconsistent with prior Tennessee caselaw. In this case, awarding a substantial proportion of non-economic damages results in a very large total verdict. This is not surprising, given the very substantial $4.3 million in economic damages.

A substantial proportion of non-economic damages in this case is not inconsistent with common sense. Upon learning of a catastrophic injury to a very young child, what immediately springs to mind is not necessarily the amount of his medical expenses or his economic loss. Rather, it is the fact that the child must live his entire lifetime with the effects of the injury, and the cumulation of everyday physical experiences that he will never have.[2]

_____

[2]In comparison, in *Palanki*, an infant underwent surgery, and the surgeon negligently removed 90% of his bladder. *Palanki*, 215 S.W.3d at 384. For the rest of his life, the plaintiff would have to use a catheter to void, but was otherwise able to engage in normal activities such as sports, getting married, having children, and earning a living. *Id.* at 384, 389. With economic damages of $417,000, the trial court suggested remittitur of the jury's verdict to $6.5 million. *Id.* at 387-88. This was found to be in the range of reasonableness on appeal. *Id.* at 389. While *Palanki* involved the appellate court's review of a trial court's suggestion of remittitur, rather than a suggestion of remittitur by the appellate court, the appellate court's findings as to the range of reasonableness for injuries much less serious than those of Billy Meals makes it of some use for comparison.

Thus, the reasons given by the majority for the suggested remittitur are not legal justification for it.

A brief overview of non-pecuniary damages and the material evidence in this case would be helpful at this juncture. In *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694 (Tenn. Ct. App. 1999), the Court described the different types of non-economic damages:

> Pain and suffering encompasses the physical and mental discomfort caused by an injury. It includes the "wide array of mental and emotional responses" that accompany the pain, characterized as suffering, such as anguish, distress, fear, humiliation, grief, shame, or worry . . . .
>
> A permanent injury differs from pain and suffering in that it is an injury from which the plaintiff cannot completely recover. It prevents a person from living his . . . life in comfort by adding inconvenience or loss of physical vigor. Disfigurement is a specific type of permanent injury that impairs a plaintiff's beauty, symmetry, or appearance. Permanent injury may relate to earning capacity, pain, impairment of physical function or loss of the use of a body part, as to a mental or psychological impairment.
>
> Damages for loss of enjoyment of life compensate the injured person for the limitations placed on his . . . ability to enjoy the pleasures of life. This type of damage relates to daily life activities that are common to most people . . . . The policy underlying the award of loss of enjoyment damages is of making the victim whole in the only way a court can – with an equivalent in money for each loss suffered.

*Id.* at 715-16 (citations omitted). The *Overstreet* Court emphasized that "each of these types of damages are separate and distinct losses to the victim," and pointed out that Tennessee's pattern jury instructions instruct juries to that effect.[3] *Id.* at 715.

The record in this case shows that the jury heard evidence of the full panoply of non-economic damages stemming from the catastrophic injuries sustained by six-year-old Billy Meals – past and future pain and suffering, disfigurement, and past and future loss of enjoyment of life. The evidence included the testimony of Billy, his mother, and an array of doctors and experts.

---

[3]The *Overstreet* Court, in a 1999 decision, declined to suggest a remittitur as to the jury verdict in excess of $2 million in compensatory damages. The injury to the adult plaintiff was the loss of one eye. *Overstreet*, 4 S.W.3d at 700, 718-19.

Prior to the crash, Billy was a normal six-year-old who liked to play baseball. In the accident, the seat belt on Billy's lap went into his abdomen, tearing the abdominal muscle, crushing organs in his abdomen and causing his vertebrae to splay apart around the lap belt. The child endured repeated surgeries and procedures to repair his abdomen, remove part of his intestines, resect his bowel, perform a colostomy, place metal rods and pins in his back, remove necrotic tissue inside and out, and drain, debride, and treat multiple wounds, abscesses, and infections in numerous locations.

Billy was rendered a paraplegic, and cannot stand or walk. He lost function of his bowel and bladder, and lost any sensation in his lower extremities. His growth is stunted by the rods in his back, his lower limbs are withered and deformed, his feet are misshapen, and he has stiffness and contractures that decrease his range of motion. He is susceptible to skin breakdown and pressure sores from being in a wheelchair. To urinate, Billy must be catheterized three times a day every day. To defecate, a suppository must be inserted into his rectum, left there for a period of time, and then someone must stimulate his rectum by inserting a finger and moving it around. This must be done for Billy every day for the rest of his life. At the time of trial, Billy was fourteen years old and trying to learn how to take care of his own defecation needs, but was not yet able to do so. Billy cannot tell if he has had a bladder or bowel accident until he smells it or feels the substance with his hand. The burden and embarrassment of his condition has caused Billy to be angry, to withdraw and to be reluctant to attend school or participate in activities. Billy remembered prior to the accident being chosen to play on an AllStar baseball team, and he missed being able to do such things. He will likely be impotent. All of his conditions are permanent. Thus, there is substantial evidence in the record as to each of the types of non-economic damages described in *Overstreet*.

As demonstrated in the analysis in *Overstreet*, to determine if remittitur is warranted, the Court must do more than simply look at the size of the award. It must review the evidence in the record as to each of the distinct types of non-economic damages, because "each of these types of damages are separate and distinct losses to the victim." *Overstreet*, 4 S.W.3d at 700-01, 715-19. The cumulative total of the evidence on all of the types of non-pecuniary damages must then be compared to the jury's total award, to determine if there is any material evidence to support the jury's general verdict. This was not done by the majority in this case.

The amount of the majority's suggested remittitur is also cause for concern. In explaining the amount of the suggested remittitur, the majority takes the amount of the Plaintiff's undisputed economic damages and neatly doubles it to fix the amount of the non-economic damages, resulting in a total award of "three times" the Plaintiff's economic damages. While

this calculation coincides with the traditional lawyer's rule-of-thumb, the majority does not relate it to any of the evidence presented at trial. If an appellate court finds that the jury's verdict is so high that there is no material evidence to support it, the appellate court has authority to suggest a remittitur *only* down to a level that is not patently excessive, in other words, "correct the judgment rendered to the extent of the excess." **Ellis**, 603 S.W.2d at 126. The amount of the majority's remittitur suggests that, instead of determining the uppermost boundary of the range of reasonableness supported by any material evidence, the majority determined "what amount the members of the court would have awarded had they been on the jury . . . ." **Id.** at 129.

Our legislature has on occasion determined, as a policy matter, that jury awards for specified types of injuries may not exceed a certain amount. **See, e.g.**, Tenn. Code Ann. § 29-39-102 (limiting compensatory damage awards for non-economic damages in certain cases). This Court is not authorized to make such policy decisions.[4]

Undoubtedly, the majority read and carefully considered all of the evidence on the Plaintiff's non-economic damages. It may be that a reasonable remittitur could be justified based on analysis of the evidence. The majority opinion, however, contains no discussion of this evidence whatsoever. Unless and until the majority does so and makes a specific finding that "there is no evidence, upon any reasonable view of the case, to support the verdict," it has stated no legal basis for suggesting a remittitur in this case. **Ellis**, 603 S.W.2d at 126. In this posture, I believe that the majority's decision amounts to a policy decision limiting the size of jury verdicts, a determination that is not appropriate for the courts.

On this basis, I must respectfully dissent from the majority's suggestion of remittitur. In all other respects, I concur.

_____
HOLLY M. KIRBY, JUDGE

---

[4]Our Supreme Court has cautioned that, for an appellate court considering remittitur, "[t]he use of the 'conscience of the Court' . . . is not appropriate." **Smith v. Shelton**, 569 S.W.2d 421, 427 (Tenn. 1978). Instead, the appellate court must determine the "upper . . . limits of th[e] range [of reasonableness] . . . by a reasoned examination of the credible proof of damages." **Id.** **See also Ellis**, 603 S.W.2d at 129.