ANDERSON, C.J., and DROWOTA and BIRCH, JJ. and O'BRIEN, Special Judge, concur.

**Dr. James R. HEADRICK, and wife, Janet L. Headrick, Plaintiffs/Appellees,**

v.

**Robert L. CARTER, Defendant/Appellant.**

Supreme Court of Tennessee,
at Knoxville.

April 10, 1995.

---

James W. Gentry, Jr., Spears, Moore, Rebman & Williams, Chattanooga, for appellees.

James R. McKoon, Bob E. Lype, Baker, Donelson, Bearman & Caldwell, O. Michael Carter, Lusk, Carter & McGhehey, Chattanooga, for appellant.

## OPINION

CHARLES H. O'BRIEN, Special Justice.

The original complaint in this case was filed by James Headrick and his wife on 10 October 1986 praying for a declaratory judgment declaring that defendant did not have the requisite authority to erect a fence around Lot 20 of the Waconda Point Subdivision, a community lot, and for a mandatory injunction requiring Carter to remove the fence around Lot 20 unless he obtained approval of all common tenants of the subdivision.

On 4 March 1987 the trial court granted Carter a preliminary motion to have all the tenants in common of the "share" lot included in the lawsuit. Some co-tenants joined the plaintiffs, others joined the defendant. Over the years, the number and make-up of the litigants fluctuated and changed. Litigants on both sides were dropped or substituted as individual property was transferred along with the accompanying undivided interest in the "share" lot. Some litigants have petitioned the court to continue in the suit on a *pro se* basis. Still others have petitioned the court to be relieved from all participation. Through it all, the primary litigants, the Headricks and Carters have been consistent in the pursuit of their day in court. This Court will refer to the litigants as the Headrick group and the Carter group for the purpose of simplicity.

The original subdivision, which was apparently platted and conveyed by the Tennessee Valley Authority was called the Waconda Cabin Site Subdivision located in Harrison, Tennessee, a suburb of Chattanooga. The subdivision consisted of 40 resident lots platted on each side of a county road, with one (1) "share" lot occupying a point of land jutting into Chickamauga Lake at the end of the subdivision. This lot was delineated as Lot No. 20. Lot 19 of the subdivision on the east side of the point and Lot 21 on the west side, face each other across Waconda Point Drive, which dead-ends into Share Lot 20. At the time of suit Lot 19 was owned and occupied by Robert Carter and his family. Lot 21 was owned and occupied by James Headrick and family. Lot 19 and Lot 21 border the north side of Lot 20. The remaining three (3) sides of Share Lot 20 are bordered by the waters of Chicamauga Lake.

As nearly as can be determined from this record, in chronological sequence, the Headricks took title to Lot 21 in June, 1965. They were at least the third owners of that property. The conveyance was made subject to certain restrictions imposed by the Tennessee Valley Authority on all the lots in the subdivision. Co-tenant ownership of the "share" lot is conveyed by deed along with the purchase of individual subdivision property. The deeds conveying the co-tenancy in Lot 20 state in pertinent part:

The grantee ... (2) Will use jointly with other grantees the land described as Lot 20, Tract XCR–15:20, said subdivision in which a joint and undivided interest is herein conveyed only for such purposes as are compatible with Cabin Site Subdivision development or as may be necessary for the enjoyment of the waters of Chickamauga Reservoir, including, but not limited to, such facilities as a club house, a caretaker's residence, boat storage and marine facilities, together with such necessary and pertinent outbuildings as may be required.

Headrick alleges that sometime around 1970 he constructed a basketball court with the permission of the various lot owners, partly on his own property and part on the "share" lot. A small part of the basketball court is on the Headricks property, the major part being on Share Lot 20.[1]

On 26 February 1981, an initial meeting of the Waconda Point Subdivision owners was held to address the use and care of the Share Lot. Eighteen (18) owners attended, including James Headrick. A majority elected Robert Carter president, and inter alia, adopted the following provision:

The majority of those attending called meetings will be considered a "majority" for authorizing projects and in determining where they will be. Only projects thus authorized will be allowed.

No other formal meeting of the owners has been held. However, in the spring of 1986, due to frequent trespass, illegal activity and unauthorized use of the "share" lot, a number of co-tenants became concerned over the ease of accessibility by road and by boat to the "share" lot. According to Carter, pursuant to a petition circulated concerning the construction of a fence on the "share" lot in response to which a substantial majority of the owners of property in the subdivision approved the erection of such a fence, bids were solicited for the construction of a chain-link fence, to be installed one (1) foot inside the boundaries of the "share" lot. Construction of the fence was begun in mid-June of 1986. When the construction of the fence reached the basketball court the litigation began and continues to this day.

On 28 November 1989 the Headricks voluntarily dismissed their original claim. The case continued on counter-complaints and ultimately came on to be heard on 6 November 1991.

The trial court made extensive findings of fact to the effect that the Headricks had by words and actions evidenced an intent to use and control the community lot as if it were their personal property to conduct construction activities on their property by having heavy equipment drive over the community lot, causing ruts, destroying trees, etc. They constructed a basketball court partially on their property and partially on the community property. They violated a temporary injunction order allowing construction of the fence on the lot line by interfering with the workmen endeavoring to complete the fence. The Court further found that a majority of the community lot owners desired to have the area fenced to provide security and protection of the property and its owners. He found that the Headricks declined to participate in the erection of a different type of fence adjacent to their property line and their continued failure to recognize their obligations and duties in regard to the community lot and the rights of the other 39 property owners resulted in a continuance of the litigation past the date of the temporary injunction order issued in May of 1990.

---

1. A large number of the counterclaims filed by other property owners dispute that the basketball court was built for the benefit of the other shareholders and allege that it was constructed solely for the benefit of the Headrick family without permission or consent of the other Waconda Point tenants in common in the "share" lot.

The court held that the temporary injunction previously entered in 1990 against the Headricks should be made permanent to enjoin them from (a) using the common "share" lot of the Waconda Point Cabin Site as a means of access for construction efforts with respect to their personally owned property adjoining the common "share" lot; (b) causing damage of any type to the common "share" lot; (c) interfering with the enclosure of the common "share" lot with a fence to keep out trespassers. The court further ruled that the Headricks were barred from using the common "share" lot in a manner that did not take cognizance of the rights of the other co-tenants.

A declaratory judgment was rendered, declaring that a majority of the co-tenants who own the common "share" lot may control the use of the common "share" lot consistent with the restrictions in the deeds and consistent with the individual rights of all the other co-tenants.

A judgment was entered in favor of the plaintiffs against the Headricks in the amount of $1,400 for the removal of the portion of the basketball court that is located on the common "share" lot.

A judgment was entered against the Headricks for payment to the plaintiffs of nominal damages in the amount of $10.00 for the damages caused by the Headricks to the trees, picnic tables, and making ruts in the common "share" lot. The court assessed punitive damages against the Headricks in the amount of $10,000 for the illegal and continuous abuse of the rights of the other co-tenants in the common "share" lot.

The Headricks appealed the judgment of the trial court. The Court of Appeals concurred with the trial court judgment that a majority of the co-tenants who own the common "share" lot may control the use of the lot consistent with the restrictions in the deeds and consistent with the individual rights of all the other co-tenants.

The Court of Appeals disagreed with the judgment of the trial court awarding the plaintiffs $1,400 for the removal of the por-

tion of the basketball court located on the common "share" lot on the premise that the basketball court had been located on the property some 20 years [2] before any complaint was made. That court concluded that the basketball court could remain so long as it was made available for the use of all the owners of the "share" lot.

The Court of Appeals concluded that the award of $10.00 for nominal damages was warranted because some of the trees and property on the common lot had been destroyed.

In light of their judgment that the Headricks were within their rights in objecting to the erection of the fence, which was the central issue in all of this controversy, the Court of Appeals ruled that though an injunction had issued prohibiting the Headricks interference with the fence, if they were guilty of violating the injunction the appropriate remedy was punishment for contempt of court, rather than punitive damages.

This Court granted an appeal from the Court of Appeals judgment for the limited purpose of considering the issue raised by the appellant, Carter group, in this Court: "Whether the erection of a fence to secure a common lot interferes with the access of the adjacent land owner who has a 1/40th individual interest in the lot, when there is a gate allowing all tenants in common the same access?" We differ with the result reached by the Court of Appeals on this issue.

The Court of Appeals began its review of the issue by examining the nature of a co-tenancy and the rights and liability of co-tenants as stated in Tennessee Jurisprudence under the title "co-tenancy," as follows:

### III. RIGHTS, DUTIES AND LIABILITIES

§ 6. **Generally.**—Tenants in common stand in a confidential relation to each other as to the joint property, and the same duties are imposed on them as if a joint trust were created by contract between them. In such case, the relation of trust and confidence between them binds

2. The record indicates that Dr. Headrick constructed the basketball court about 1970. This suit was initiated in 1986.

all to put forth their best exertions to protect the common interest, and forbids the assumption of a hostile attitude by any of them towards the rest.

The possession of one is the possession of all unless he claims to hold exclusively for himself. Tenants in common are jointly seized of the entire estate, each having an *equal right of entry*, and the possession of one is regarded as the possession of all until a disseisin of the others by actual ouster. Each has the same right to the possession, and the title of each extends to the whole. (Citations omitted). (Emphasis supplied).

The Court of Appeals went on to say "in view of the fact that the Headricks have an equal right of possession of the common property, we conclude that their right to enter may not be impaired. In reaching this conclusion, we are aware of the defendant's position that the meeting of the lot owners on February 26, 1981, authorized a majority to authorize projects, including erection of a fence.[3] We believe, however, implicit in this authorization is the understanding that the majority would not authorize any project which would impair the inherent rights of a co-tenant. To put it another way, we think without question that the majority of lot owners could not exclude the Headricks from entry into the property. Neither do we believe that they may impair their entering. Thus, while we agree with the judgment of the trial court that 'a majority of the co-tenants ... may control the use of the common "share" lot consistent with the restrictions in the deeds and consistent with the individual rights of all the other co-tenants,' we perceive the individual rights of a co-tenant to include *unimpeded right of access.*" (Emphasis supplied).

■ The parties hereto and the Court of Appeals have confused the right of entry of a co-tenant with the opportunity for access which the Headricks enjoyed as a result of their contiguous property line with the community lot. They have never lost and to this day they retain the same right of entry possessed by each of their co-tenants to the community lot. The gate into the property is only a few feet from the Headricks front property line. It is true that their opportunity for access to the community lot has been limited by construction of the fence. However, they still have greater access to that property lot than many of their subdivision neighbors by virtue of the fact that the fence only extends to the high water line. They need only walk around the end of the fence from their backyard to gain access to the community lot. This is a privilege that most of their co-tenants do not share .. It is plain that Dr. Headrick exercised his opportunity for access by construction of the basketball court across the property line so that approximately two-thirds of it is situated on the community lot. It is not at all clear from the record that a majority of the co-tenants agreed to this action. We consider that a matter for decision by the trial court. The Headricks have not been denied the right of entry.

The trial courts Order and Judgment stated in pertinent part, in reference to the basketball court protruding on the community lot that "plaintiff shall have and recover in judgment against Dr. James R. Headrick and wife, Janet L. Headrick, jointly and severally, in the amount of One Thousand Four Hundred ($1,400.00) Dollars for the removal of the portion of the basketball court that is located on the common share lot".

The Court of Appeals disposed of the issue of the basketball court by ruling that since it *had existed for some twenty (20) years* before the complaint was filed, and that the court was available for all the lot owners through the years and had been used by them, they had not been ousted. They concluded that the basketball court could remain so long as it was available for the use of all the owners of the share lot. They did not mention the One Thousand Four Hundred ($1,400.00) Dollar judgment awarded the other lot owners.

Having determined that the erection of the fence did not impair the Headrick's right of entry to the community property requires a further discussion of the issue of punitive damages. The Court of Appeals questioned whether such an award was appropriate where no compensatory or nominal damages were awarded and held that the judgment

---

3. Dr. Headrick was present and apparently ac-  quiescing at that meeting.

was improper in light of their finding that the Headrick's were within their rights in objecting to the erection of the fence. The court recognized that an injunction had issued prohibiting the Headricks interference with the fence but observed that the appropriate remedy if they were guilty of violating the injunction was punishment for contempt of court, rather than punitive damages.

After reviewing the record, and in light of the Court of Appeals Judgment on the issue of punitive damages, this court directed counsel to rebrief the issue of taxing punitive damages, including the priority of said assessments by the trial court, the amount of said damages and to whom damages should be paid in the event the award was approved. Those briefs have now been filed.

■ We think the cases cited by the Court of Appeals are not applicable on the question of whether an award of punitive damages was appropriate. The trial court found that the evidence established that the Headricks, by words and actions, evidenced an intent to use and control the community lot as if it belonged to them alone. It found that even after the court ordered at the temporary injunction hearing that the fence desired by the majority of the tenants in common could be completed the Headricks stopped the fencing contractor when he came out to complete the work. After reciting a litany of their obstructive conduct the court further found that the case could have ended at the temporary injunction hearing had the Headricks been willing to recognize their obligations and duties with regard to the community lot and the case had continued because of their obstinate refusal to recognize that the other thirty nine (39) subdivision lot owners had an undivided interest in that property. The court awarded punitive damages for the illegal and continuous abuse of the rights of the other co-tenants, even after the court had ordered that the fence could be constructed. In *Robbins v. Frazier*, 52 Tenn. 100, 104 (1871), the court made these cogent comments:

It must not be overlooked that the willful disobedience of, or resistance to, a lawful process of a Court is a high offence, and the very existence of the Courts require that such offences shall be followed by prompt punishment.

As a general rule, the punishment will be confined to fine or imprisonment, and the extent of one or both, not exceeding the limit prescribed, will be governed by the facts and circumstances of each case. The mode of punishment by fine and imprisonment is intended to vindicate and protect the just power and integrity of the Court. But, sec. 4109 [T.C.A. § 29-9-105] goes further—it combines punishment by way of vindicating the Court, with damages by way of compensating the party for injury arising from the illegal disobedience of the process of the Court. The actual injury thus sustained, ascertained by viewing all the facts and circumstances, will constitute the measure of damages in each case. It is said by Mr. Sedgwick, p. 33, that "in all cases growing out of non-performance of contracts, and in those of infringements of rights, or non-performance of duties created or imposed by the law, in which there is no element of fraud, willful negligence or malice, the compensation recovered in damages consists solely of the direct pecuniary loss." ... "Where fraud, malice, gross negligence or oppression intervenes, the law adopts a wholly different rule." "It blends together the interest of society and of the aggrieved individual, and gives damages not only to recompense the sufferer, but to punish the offender."

Such was the object of the Legislature in subjecting a party willfully disobeying a process of Court to punishment and to the payment of damages—to punish him for the contempt, and to make him liable for the damages inflicted, by his disobedience of the process, upon the party injured.

It is plain from his testimony that Dr. Headrick was primarily concerned with the aesthetic properties of the fence, or more properly, in his mind its lack of those values. He testified "I have no objection to a fence that will go down between my house and the "share" property that an architect, a landscape man will say fits the decor. I will never consent to a chain-link fence or a variable thereof which devalue and detract from my property. Some of the people are aware of this, and why it has to be a chain-link fence is beyond me". His adamant attitude and resistance to the will of the majority of his co-tenants, resulted in a prolongation of

the litigation, causing them to incur fees and expenses totally unnecessary if he had accepted the alternative offered to him to have a different type of fence constructed along that area of his property adjoining the community lot.

We reverse the judgment of the Court of Appeals insofar as it conflicts with the judgment of the trial court and affirm the judgment of the trial court in its entirety. The proceedings are remanded to the trial court for disposition of punitive damages. The costs on appellate review are assessed against the original plaintiffs, Dr. and Mrs. James Headrick.

ANDERSON, C.J., and DROWOTA, REID and BIRCH, JJ., concur.