IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 9, 2003 Session

**OVERNITE TRANSPORTATION COMPANY**
v.
**TEAMSTERS LOCAL UNION NO. 480, AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL-CIO; AND BILLY D. CULLEN; EDDIE MIMS; KENNIE GEORGE; ISOM ("BUTCH") FOLSOM, INDIVIDUALLY AND IN THEIR CAPACITY AS OFFICERS AND MANAGING AGENTS OF TEAMSTERS LOCAL UNION 480; AND SEVERAL JOHN DOES**

**An Appeal from the Chancery Court for Davidson County**
**No. 99-3105 III      Ellen H. Lyle, Chancellor**

———————————

**No. M2002-02116-COA-R3-CV - Filed February 27, 2004**

———————————

This case arose out of a labor dispute. In October 1999, the defendant union began a labor strike at the plaintiff trucking company's Nashville facility. The company filed a petition in the lower court seeking to enjoin the union from engaging in violence and intimidation in connection with the strike. The company later amended its complaint to include a claim against the union for intentional interference with business relations. Between October 1999 and January 2000, the trial court entered five injunctions against the union, each more restrictive than the one before, enjoining the union from engaging in the alleged unlawful violence and intimidation. In August 2000, the trial court issued a show cause order, citing 128 alleged violations of the injunctions, requiring the union to show cause why it should not be held in civil contempt. In March 2002, the trial court determined that the company's petition for civil contempt was moot because, by that time, the contemptuous conduct had ceased. In August 2002, the trial court dismissed the company's claim for intentional interference with business relations for failure to state a claim. The plaintiff trucking company now appeals. We reverse the dismissal of the civil contempt petition, finding that the company may seek damages caused by conduct in violation of the injunctions, and affirm the dismissal of the intentional interference claim.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part and Reversed in part and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Kenneth A. Weber, Nashville, Tennessee; and Christopher A. Johlie and Melissa Crawford Mazzeo, Chicago, Illinois, for the appellant, Overnite Transportation Company.

James G. Stranch, III, and Mark A. Mayhew, Nashville, Tennessee, for the appellee, Teamsters Local Union No. 480.

George E. Barrett, Nashville, Tennessee, for the individual appellees, Billy D. Cullen, Eddie Mims, Kennie George, Isom ("Butch") Folsom.

**OPINION**

Plaintiff/Appellant Overnite Transportation Company ("Overnite") is a trucking company based in Richmond, Virginia. Overnite operates a service center in LaVergne, Tennessee, near Nashville ("the Nashville facility"). Defendants/Appellees, Teamsters Local Union No. 480 ("the Union"), is affiliated with the International Brotherhood of Teamsters, Chauffers, Warehousemen, and Helpers of America. The four individuals, Defendants/Appellees Billy Cullen, Eddie Mims, Kenny George, and Isom "Butch" Folsom (collectively, "individual defendants"), were sued in their individual capacities and as officers of the Union.

This case arises out of the Union's lengthy campaign to represent Overnite employees in collective bargaining. In 1995, a representation election was conducted at Overnite's Nashville facility for Overnite employees to vote on whether the Union would represent them in collective bargaining with Overnite's management. The Union lost the election, and consequently filed an election protest with the National Labor Relations Board ("NLRB"). The NLRB set aside the election and ordered Overnite to bargain with the Union without conducting a new election. ***See In re Overnite Transp. Co.***, 1999 WL 33453666 (NLRB July 13, 1999), and ***In re Overnite Transp. Co.***, 2001 WL 946528 (NLRB August 16, 2001). The NLRB's order was appealed to the United States Court of Appeals for the Fourth Circuit.

While the appeal of the NLRB order was pending,[1] Overnite and the Union engaged in collective bargaining. After numerous bargaining sessions between Overnite and the Union, the parties could not resolve their differences. Consequently, on October 24, 1999, the international Teamsters organization commenced a nationwide strike against Overnite. The local chapter of the Union at the Nashville facility actively participated in the strike and set up picket lines there. Within hours of commencement of the strike, numerous incidents involving violence, weapons, and threats

_____

[1]The appeal was decided in 2002. On appeal, the Fourth Circuit Court of Appeals determined that, although Overnite had violated the National Labor Relations Act ("NLRA"), a mandatory bargaining order was not an appropriate remedy because of the number of employees hired since the election. ***See Overnite Transp. Co. v. NLRB***, 240 F.3d 325 (4th Cir. 2001), ***rev'd***, 280 F.3d 417 (4th Cir. 2002) (*en banc*).

began to occur, with the apparent objective of intimidating Overnite employees who crossed the picket line in order to work.

On October 27, 1999, Overnite filed the instant lawsuit seeking injunctive relief against the Union, as well as actual and punitive damages. At a hearing held on October 29, 1999, Overnite submitted an amended complaint with attached affidavits alleging that Union members were brandishing guns and knives, blocking and damaging vehicles as they were being driven in and out of the facility, and threatening to harm workers physically who attempted to cross the line.[2] At the conclusion of the hearing, the trial court issued a temporary injunction order. In that order, the trial court prohibited the Union and its supporters from making contact with Overnite employees or equipment; required the Union to designate a responsible leader; and required the Union to reduce its mass of picketers to a reasonable number.

Despite the injunction, incidents of violence and intimidation escalated.[3] On November 4, 1999, Overnite filed a motion seeking to require the Union to show cause why it should not be held in contempt of court for violating the October 29, 1999 order, and also to modify the injunction to place more restrictions on the Union. In support of its motion, Overnite submitted videotaped footage of some of the conduct of which it complained. On the same day, the trial court dissolved its original order and issued a second, more restrictive temporary restraining order. The trial court noted that it had "not heard the Teamsters' side," but concluded that a restraining order was necessary to prevent irreparable harm to persons and property. A hearing was set for November 8, 1999, to determine whether an even more restrictive temporary injunction was warranted.

The second injunction apparently did little to curb the misconduct. The next day, on November 5, 1999, Overnite filed an "emergency" motion to require the Union to show cause why it should not be held in contempt for violating the trial court's November 4, 1999 order, and requesting further modification of the temporary injunction. Overnite presented evidence of gun shots, bomb threats, and more window-shattering activity.[4] On the same day, the trial court entered an order supplementing its previous order. The trial court found that the evidence submitted by

---

[2] The affidavits by Overnite employees alleged that Union representatives cursed at them and threatened them with bodily harm, wielding knives and guns and warning them not to cross the picket line. Another affidavit alleged that Union representatives pulled their cars in front of Overnite trucks and slammed on their brakes, causing the Overnite employees also to slam on their brakes to avoid an accident. Still another affidavit alleged that Union representatives may have been responsible for putting a bullet hole in an Overnite employee's windshield.

[3] Overnite alleged that the Union exceeded the number of pickets as set forth in the temporary injunction, and that it also failed to report their picket line leaders to Overnite security guards as required by the injunction. In addition, Overnite alleged that Union members continued to shatter windows of personal vehicles belonging to Overnite employees, throw objects at the employees, and strike Overnite trucks with sticks and pickets.

[4] Among other things, firecrackers were set off during the evening of November 4 and the morning of November 5, 1999, and gunshots were fired at two portable lights that had been placed just inside the entrance gate to the facility. Also, an Overnite dispatcher received a bomb threat, requiring evacuation of the Overnite Service Center while police searched the premises.

Overnite established incidents of criminal activity, but did not link the criminal activity to the local Teamsters group. The trial court stated in its order that a court is "not the entity designated to halt such essentially anonymous criminal activity," and that "[a]n injunction is not the way to stop crime." Nevertheless, the November 4 restraining order remained intact and further restrictions were placed on the Union. On November 8, 1999, after a hearing, the trial court converted the November 5 and 6 temporary restraining orders into a temporary injunction.

On November 24, 1999, Overnite filed another motion to modify the temporary injunction and to address further unlawful conduct since the entry of the November 8 order. Like the previous motions, the November 24 motion requested that the Union be required to show cause why it should not be held in contempt of court. On January 14, 2000, the trial court granted Overnite's motion to modify the injunction and, for the fifth time, added further restrictions. The trial court denied Overnite's request for a show cause order with respect to criminal contempt charges, finding that Overnite had failed to proffer particularized facts linking the alleged misconduct to the local Teamsters organization. The trial court also denied Overnite's request for a show cause order with respect to civil contempt, stating that Overnite had failed to specify the particular damages it suffered, as well as the amount of such damages, and did not show that the Union was responsible for the damages.

On January 21, 2000, Overnite filed a motion to amend its complaint to add a claim for intentional interference with business relationships, and also to add as defendants the four individual members of the Union named above, Cullen, Mims, George, and Folsom, alleging that they participated in the strike misconduct.[5] On February 4, 2000, the trial court granted Overnite's motion to amend.

In February 2000, the Union learned that the bond posted by Overnite for the initial injunction was untimely and substantively defective under Rule 65 of the Tennessee Rules of Civil Procedure.[6] Consequently, on February 14, 2000, in the pleading filed by the Union in opposition to Overnite's petition for contempt, the Union raised the issue of the defective bond. The Union alleged that the bond posted by Overnite was not an injunction bond, but was actually a cost bond. It argued that the failure to file a proper bond voided any injunction orders issued by the trial court and, therefore, barred any contempt proceedings. On March 10, 2000, without conceding the merits of the Union's position, Overnite filed an amended bond. On March 14, 2000, the trial court entered an order rejecting the Union's argument regarding the defective bond, noting that Rule 65.05(3) of the Tennessee Rules of Civil Procedure provides a means by which a party can challenge the

---

[5] The claim for intentional interference with business relations had been alleged against the Union and the individual defendants in a separate action filed in a Davidson County Circuit Court in November 1999. In January 2000, the defendants in that case filed a motion to dismiss based on the doctrine of former suit pending, citing the case at bar as the first suit filed. In light of that motion, Overnite was permitted to combine its circuit court action with this case and, to that end, filed the January 2000 motion to amend.

[6] The Union claims that it was unable to obtain a copy of the bond from the court clerk's office until February 2000, because the file was not lodged with the clerk & master, but was with the court.

-4-

sufficiency of a bond. On this basis, the trial court held that the Union was foreclosed at that late date from challenging the sufficiency of the bond.

On March 27, 2000, the Union filed an answer to Overnite's complaint, asserting several affirmative defenses.[7] Among other things, the Union contended that Overnite's claim was preempted by federal law, and that the lawful publication of its grievances against Overnite was protected speech under the federal and state constitutions. The Union maintained that no valid injunction had ever been entered against it, since Overnite failed to file a valid injunction bond as required under Rule 65 of the Tennessee Rules of Civil Procedure. In addition, the Union claimed that Tennessee does not recognize a claim for intentional interference with business relationships or, in the alternative, that such a claim would also be preempted by federal law.

On June 23, 2000, Overnite filed an amendment to its motion for an order to show cause, attaching affidavits detailing 131 specific allegations of contemptuous conduct by the Union. On August 4, 2000, the trial court entered an order finding that Overnite had presented sufficient evidence to require the Union to show cause why it should not be held in criminal contempt for 128 of the alleged violations.[8]

On November 21, 2000, the trial court entered an order concluding that Overnite was entitled to seek compensatory damages resulting from the Union's contemptuous conduct, pursuant to Tennessee Code Annotated § 29-9-105. This statute provides:

> If the contempt consists in the performance of a forbidden act, the person may be imprisoned until the act is rectified by placing matters and person in status quo, or by the payment of damages.

Tenn. Code Ann. § 29-9-105 (2000). The trial court reasoned that the plain language of the statute provides for damages as a remedy, and that Tennessee case law also supported Overnite's claim. The trial court reiterated its previous rejection of the Union's argument that Overnite's failure to post an adequate bond rendered the injunctions void. The trial court recognized that, in some jurisdictions, the failure to post an adequate bond makes an injunction void *ab initio*; in other jurisdictions the injunction is merely voidable. The trial court adopted the reasoning that such an injunction is voidable, not void, and is enforceable even if the bond posted in support of it was inadequate. In addition, the trial court stated that it would consolidate the hearing on the criminal contempt charge with the hearing on Overnite's petition to recover damages. The Union filed an application for an interlocutory appeal from the trial court's order, but the application was denied by this Court.

---

[7] The answer was titled "Answer of Defendants," which presumably included the individual defendants as well as the Union.

[8] Three of the alleged violations were not included because those allegations did not indicate that the local Teamsters organization participated in that conduct.

On January 21, 2001, the District Attorney General for Davidson County submitted a notice to the trial court that it declined to prosecute the criminal contempt charges. On June 19, 2001, the trial court set a trial date of April 1, 2002 for the civil contempt charges. On January 18, 2002, the Union filed a motion to dismiss or, in the alternative, for summary judgment. On the same day, the individual defendants also filed a motion to dismiss or for summary judgment, adopting and incorporating by reference the motion filed by the Union. In its motion, the Union claimed, among other things, that Overnite was not entitled to recover damages for civil contempt, because it sought retrospective punishment instead of prospective remedial action. The Union maintained that "compensatory civil contempt" was not recognized in Tennessee and that, therefore, Overnite's claims should be dismissed.[9]

On March 12, 2002, the trial court entered an order granting in part the Union's motion for summary judgment. The trial court dismissed Overnite's petition for civil contempt as moot, because it was undisputed that the picketing had not been in place for over a year prior to the trial court's decision. The trial court recognized its previous November 2000 ruling "that compensatory damages are recoverable in an action for civil contempt pursuant to section 29-9-105." The trial court noted, however, that "[t]he facts . . . in the case at bar have changed." The trial court reasoned that, "since the strike is no longer being conducted, action taken by this Court on the contempt petition would not be coercive and remedial (i.e. civil contempt) but in the nature of a punishment (i.e. criminal contempt)." Therefore, the trial court concluded that the petition for civil contempt was moot.

On August 9, 2002, the trial court entered an order dismissing Overnite's claim for intentional interference with business relationships.[10] Overnite had stipulated that it was not asserting a cause of action for interference with prospective economic advantage, but rather that the Union had interfered with Overnite's relationship with its employees and the security guards it had hired to protect the employees from violence. The trial court concluded that Overnite's cause of action was actually a claim of inducement to breach a contract. Because Overnite made no allegation that it had incurred damages resulting from a breach of contract – a necessary element in a claim for inducement to breach – the trial court concluded that the averment failed to state a claim for relief. The trial court concluded, in the alternative, that, even if a proper claim for inducement to breach had been asserted, summary judgment should be granted to the Union, because Overnite submitted no evidence of a breach of contract. The trial court added that, to the extent that Overnite sought recovery of economic damages resulting from intentional interference with business relations, such a claim would have been preempted by federal law. The trial court's order dismissed all of Overnite's claims as to all defendants, stating explicitly that it was a final order. Overnite filed this timely appeal.

---

[9] The Union did not reassert that the failure to post an adequate bond invalidated the trial court's injunction orders.

[10] The trial court also dismissed Overnite's "damage to personal property" claim, finding that there was no such action in Tennessee law. It opined, however, that such a claim would not be preempted by federal law.

On appeal, Overnite first argues that the trial court erred in dismissing its claim for compensatory damages resulting from the Union's civil contempt. Overnite asserts that recovery for damages caused by the Union's contemptuous conduct is authorized under Tennessee Code Annotated § 29-9-105, regardless of whether the Union members continued to engage in conduct in contempt of the injunctive orders. Overnite also argues that the trial court erred in dismissing its intentional interference claim, contending that a breach of contract is not an element of such a cause of action. Overnite contends further that the trial court erred in determining that its claim for intentional interference would be preempted by federal law.

In response, the Union argues that the trial court correctly dismissed Overnite's claims. The Union asserts, however, that the trial court should have also dismissed Overnite's petition for contempt because the defective bond posted by Overnite rendered the injunctions void. The Union also maintains that the trial court was correct in dismissing Overnite's claim for intentional interference with business relationships, because that claim is preempted by the federal law,[11] and because the evidence was insufficient to support such a claim. The individual defendants filed an appellate brief on their own behalf, arguing that, because the show cause order issued by the trial court applied only to the Union, the individual appellees were never a party to the civil contempt proceedings. Second, the individual defendants argue that, because Overnite failed to respond to their motion to dismiss or for summary judgment, their motion should have been granted on this basis.

The trial court's factual findings are reviewed *de novo* on the record with a presumption of correctness, unless the preponderance of the evidence is otherwise. ***Reed v. Hamilton***, 39 S.W.3d 115, 117 (Tenn. Ct. App. 2000); Tenn. R. Civ. P. 13(d). The trial court's conclusions of law are reviewed *de novo*, with no such presumption. ***Reed***, 39 S.W.3d at 117. Issues of statutory interpretation and the application of a statute to particular facts involve questions of law, which are subject to *de novo* review. ***Shelton v. ADS Environmental Serv.***, 100 S.W.3d 214, 216 (Tenn. 2003); ***Ganzevoort v. Russell***, 949 S.W.2d 293, 296 (Tenn. 1997).

We first address Overnite's claim for damages under Tennessee Code Annotated § 29-9-105, which states that if the contemptuous conduct is the performance of a forbidden act, "the person may be imprisoned until the act is rectified . . . by the payment of damages." Tenn. Code Ann. § 29-9-105 (2000). The trial court concluded in its November 21, 2000 order that section 29-9-105 authorizes the recovery of compensatory damages in a contempt proceeding when the contempt involves the performance of a forbidden act. Citing several cases, the trial court reasoned that damages under the statute are compensatory in nature, serving to compensate the aggrieved party for losses sustained as a result of wrongful and contemptuous actions. Later, in its March 12, 2002 order, the trial court acknowledged its previous ruling, but noted that "[t]he facts . . . in the case at bar have changed." Because the Union had no pickets in place for over a year, and the contemptuous conduct had therefore ceased, the trial court deemed the petition for civil contempt to be moot.

---

[11] Though the Union argued in the trial court that the petition for civil contempt was preempted by federal law, it has not made that argument on appeal.

Thus, when the trial court's orders are read together, it concluded that compensatory damages under section 29-9-105 are available only when the contemptuous conduct is ongoing and the award of such damages would serve to coerce the contemnor into compliance with the court's order.

As noted by the trial court, a petition for civil contempt compels "the doing of something by the contemnor, which, when done, will work his discharge." **Shiplet v. State**, 400 S.W.2d 542, 543 (Tenn. 1966). An essential element of civil contempt is the ability of the contemnor to comply with the order at the time of the contempt and be able to purge himself of the contempt. **Ahern v. Ahern**, 15 S.W.3d 73, 79 (Tenn. 2000). The contemnor has the "keys to the jail," which means he can purge his contempt by complying with the court's order. **Id.** On the other hand, criminal contempt is "punitive in character, and the proceeding is to vindicate the authority of the law and the court as an organ of society." **Id.** "[A] fine levied after the contemnor defies a threat imposed to deter future conduct" has the attributes of a criminal sanction. **Young v. Young**, No. 01-A-01-9609-CV-00415, 1997 WL 107159, at *1 n.1 (Tenn. Ct. App. Mar. 12, 1997).

The Union argues that, in this case, any monetary award could only be punitive, not coercive, since it is undisputed that, by the time of the hearing on damages, the contemptuous conduct had ceased. Therefore, as found by the trial court, an award of civil contempt sanctions at that point would have been fruitless, and section 29-9-105 does not authorize criminal sanctions.

The Union concedes that there may be situations in which contempt remedies sound in both civil and criminal contempt. It asserts, however, that section 29-9-105 does not apply in cases involving labor dispute injunctions, because contempt arising from a Union's violations of an injunction is always "criminal rather than civil in nature." **See Strunk v. Lewis Coal Co.**, 547 S.W.2d 252, 253 (Tenn. Crim. App. 1976); **Nashville Corp. v. United Steelworkers of America**, 215 S.W.2d 818, 820 (Tenn. 1948) (holding that the union's violation of an injunction "falls under the criminal class as distinguished from civil"). In **Strunk**, the trial court issued an injunction prohibiting the union from engaging in violence or mass picketing. The union violated that order, and the coal company filed a petition for contempt. On appeal was the single issue of whether the trial court had applied the appropriate standard of proof in determining guilt. **Strunk**, 547 S.W.2d at 253. In deciding the issue, the trial court determined that the contempt alleged was criminal in nature, rather than civil, "regardless of the fact that the original proceeding was brought in a court of equity." **Id.** The Union cites this authority as establishing that the violation of an injunction in a labor dispute is *always* criminal in nature, and that civil remedies are therefore not available.

However, the cases upon which the Union relies do not discuss the application of the section 29-9-105, nor do they support the Union's broad assertion that *all* contempt petitions in labor disputes must be deemed criminal in nature. Rather, cases addressing the applicability of section 29-9-105 indicate that, when a party violates an order forbidding the performance of a certain act, the statute authorizes the person injured by contemptuous conduct to file a petition for civil contempt and to request that the party in contempt be imprisoned "until the act is rectified . . . *by the payment of damages*." Tenn. Code Ann. § 29-9-105 (2000) (emphasis added). The trial court recognized the effect of this provision in its November 2000 order, citing several cases in which courts have

assessed compensatory damages in a civil contempt proceeding for injury arising out of the contemnor's disobedience.

For example, in **Reed v. Hamilton**, 39 S.W.3d 115 (Tenn. Ct. App. 2000), the plaintiffs filed a declaratory judgment action, requesting a declaration that an easement existed over the defendants' real property for the benefit of the plaintiffs, in order to afford the plaintiffs access to their own property.[12] Soon after the lawsuit was filed, the trial court issued a temporary restraining order enjoining the defendants "from interfering, obstructing, or preventing" the plaintiffs from using the claimed easement. **Reed**, 39 S.W.3d at 116. Later, the plaintiffs filed separate petitions for contempt, alleging that the defendants had violated the restraining order by depriving them of the use of the easement and access to their properties. The trial court held a hearing and determined that the defendants had, in fact, willfully violated its previous order. **Id.** at 117. Subsequently, the trial court entered an order finding that the defendants were in civil contempt of court, but concluding that the plaintiffs had not sustained any actual damages as a result of the defendants' actions. However, the trial court awarded the plaintiffs attorney's fees as "sanctions and damages" under section 29-9-105. **Id.**

On appeal, the **Reed** defendants challenged the trial court's authority to assess "sanctions and damages" against them in the civil proceedings, particularly in light of the court's finding that no actual damages had been suffered. The defendants argued that, under Tennessee Code Annotated § 29-9-103, the trial court was not authorized to impose a fine for civil contempt over $50.[13] The appellate court disagreed, concluding that the damages awarded were recoverable under section 29-9-105:

> As a direct result of the [defendants'] actions, [the plaintiffs] were forced to incur attorney's fees associated with the filing of petitions for contempt and hearings subsequently held thereon. As noted by this Court in [**Keeley v. Massey**, No. 02A01-9307-CH-00159, 1994 WL 59556 (Tenn. Ct. App. Feb. 28, 1994)], damages under section 29-9-105 are compensatory in nature. The trial court's award of attorney's fees served to compensate [the plaintiffs] for the loss they sustained as a result of the wrongful and contemptuous actions of the [defendants]. Under such circumstances,

---

[12] The trial court cited the **Reed** decision in support of its November 2000 decision, but did not give the case authoritative weight because the case was unpublished at that time.

[13] That statute provides:

(a) The punishment for contempt may be by fine or by imprisonment, or both.

(b) Where not otherwise specially provided, the circuit, chancery, and appellate courts are limited to a fine of fifty dollars ($50.00), and imprisonment not exceeding ten (10) days, and, except as provided in § 29-9-108, all other courts are limited to a fine of ten dollars ($10.00).

Tenn. Code Ann. § 29-9-103 (2000).

we think that the court properly concluded that the attorney's fees incurred by [the plaintiffs] are among the types of damages that are compensable under section 29-9-105.

*Id.* at 120. Thus, the court held that damages under section 29-9-105 are available to compensate an injured party for injuries caused by contemptuous conduct.

In reaching this conclusion, the **Reed** court relied on two cases, **Keeley v. Massey**, No. 02A01-9307-CH-00159, 1994 WL 59556 (Tenn. Ct. App. Feb. 28, 1994), and **Kuykendall v. Latham**, 1991 WL 10178 (Tenn. Ct. App. Feb. 4, 1991). In **Keeley**, the appellate court upheld an award of attorney's fees as damages arising out of the contemnor's disobedience. The **Keeley** court opined that "the chancellor was vested with the power to assess damages under T.C.A. § 29-9-105. Damages are to be compensatory in nature, and the appropriate measure for civil contempt compensatory damages is actual loss." **Keeley**, 1994 WL 59556, at *5. The court added that the damage award could include attorney's fees. **Id.** In **Kuykendall**, the trial court enjoined the defendants from operating a business that was allegedly in violation of a covenant not to compete. The defendants violated the injunction, and the plaintiff filed a motion for contempt. The trial court determined that the defendants were in contempt of court, and awarded the plaintiff $350 in attorney's fees and $1,750 in damages as a result of the violation. The appellate court upheld the trial court's damage award, stating that "[t]he court had the authority to award damages in this contempt proceeding by virtue of T.C.A. § 29-9-105 . . . ." **Kuykendall**, 1991 WL 10178, at *2. The **Kuykendall** court observed that there could be no damage award unless actual damages had been proven. **Id.**

Other cases have also recognized that compensatory damages under section 29-9-105 are available when the contempt involves the performance of a forbidden act. **See Bryan v. Leach**, 85 S.W.3d 136, 161, n. 27 (Tenn. Ct. App. 2001) (recognizing that "Tennessee appears to have incorporated the concept of damages arising from contempt in Tenn. Code Ann. § 29-9-105 . . . ."); **Brummett v. McCoury**, No. 03A01-9512, 1996 WL 285405, at *2 (Tenn. Ct. App. 1996) (noting that damages arising out of contempt is autorized by the statute). In discussing the predecessor to section 29-9-105,[14] the Tennessee Supreme Court explained in **Robbins v. Frazier**, 52 Tenn. (5 Heisk) 100 (1871), that the damages assessed combine punishment, vindicating the authority of the court, with compensation in favor of the party injured by the performance of a forbidden act. **Robbins**, 52 Tenn. (5 Heisk) at 104; **see Headrick v. Carter**, 897 S.W.2d 256, 261 (Tenn. 1995) (citing **Robbins** with approval). The measure of damages in such a case is the actual damages sustained by the injured party. **Robbins**, 52 Tenn. (5 Heisk) at 104.

The Union argues, and the trial court apparently found, that damages under section 29-9-105 are not available if the contemptuous conduct has ceased. And yet, even if the contemptuous

_____

[14]The **Robbins** Court discussed section 4107, which was essentially identical to Tennessee Code Annotated § 29-9-105.

-10-

conduct has ceased, the doing of the forbidden act has not been "rectified," *i.e.* made right,[15] until damages have been paid to make whole the party against whom the forbidden act was committed. Unlike a sanction imposed solely to vindicate the authority of the court, a monetary award is not authorized unless actual damages have been sustained, at least to the extent that the party against whom the contempt was committed was compelled to take legal action, and incur attorney's fees, in order to secure compliance with the injunction. ***Reed***, 39 S.W.3d at 120. Under the Union's reasoning, a party that caused damages by its contemptuous conduct could extinguish the injured party's claim for damages merely by ceasing the contemptuous conduct, which, of course, should have been done to begin with. This reasoning is simply wrong. Thus, under these circumstances, we must conclude that the trial court erred in dismissing as moot Overnite's petition for civil contempt damages.

This conclusion does not end our inquiry. The Union argues that, even if Overnite's petition for civil contempt is not moot, this Court should dismiss the petition, because Overnite's failure to post an adequate bond pursuant to Rule 65.05(1) of the Tennessee Rules of Civil Procedure rendered the injunctions void. Rule 65.05(1) provides:

(1) Except in such actions as may be brought on pauper's oath, no restraining order or temporary injunction shall be granted except upon the giving of a bond by the applicant, with surety in such sum as the court to whom the application is made deems proper, for the payment of such costs and damages as may be incurred or suffered by any person who is found to have been wrongfully restrained or enjoined. . . .

Tenn. R. Civ. P. 65.05(1). Thus, Rule 65.05(1) requires that the bond be made to protect the party enjoined from "such costs and damages as may be incurred or suffered." The Union argues that, because neither the original nor the amended bond inured to its benefit to compensate it for a wrongful injunction, then the bond was deficient and the injunctions, therefore, were void *ab initio*.

In addition, the Union argues that the injunctions issued by the trial court contained mandatory "self-executing" language, providing that injunctive relief was expressly conditioned on Overnite posting a proper bond. The October 29, 1999 order provided:

9. The plaintiff shall post a fifteen thousand dollar ($15,000.00) bond on or before 12:00 p.m. November 1, 1999, to maintain the injunction.

10. Providing the plaintiff posts the bond in the time allocated by the Court, the injunction shall remain in effect until further order of the Court.

---

[15] "Rectify" means "to set right" or to remedy. WEBSTER'S NEW COLLEGIATE DICTIONARY 959 (1981).

Therefore, the trial court's order provided that Overnite "shall" post a bond "to maintain the injunction," and that the injunction would remain "[p]roviding the plaintiff posts the bond in the time allocated by the Court."

The facts surrounding this issue are undisputed in the record. At approximately 12:11 p.m. on November 1, 1999, eleven minutes past the deadline, Overnite faxed a copy of the bond it intended to file to the clerk of the trial court. On November 2, 1999, at 11:02 a.m., one day after the deadline, a bond was posted by Overnite. Although it was titled "injunction bond," the bond posted was only a cost bond; it did not recite that it was security for damages to the Union. The trial court presumed the bond to have been sufficient, stating in subsequent orders that "[t]he bond which has been posted by the plaintiff in support of the October 29, 1999 temporary injunction is the security for the issuance of this restraining order [or temporary injunction]."

The Union did not object to the bond until February 2000, over three months after the first injunction was issued. In its response to Overnite's January 2000 motion for contempt, the Union argued for the first time that the injunctions were void because of the untimeliness and insufficiency of the bond posted by Overnite. On March 10, 2000, Overnite filed a replacement bond, without conceding the merits of the Union's position. The Union claimed that the replacement bond was defective as well, because it inured to the benefit of the court clerk, not to the Union for damages sustained from a wrongfully issued injunction.

As we have noted, Rule 65.05(1) requires that a bond be posted in order to issue a restraining order or temporary injunction. Tenn. R. Civ. P. 65.05(1). Rule 65.05(3) provides a remedy for a party who asserts that a surety is insufficient or the amount of the bond is insufficient:

> A party restrained or enjoined may move the court for additional security; and if it appears on such motion the surety is insufficient or the amount of the bond is insufficient, the court may vacate the restraining order or temporary injunction unless within a reasonable time sufficient security is given.

Tenn. R. Civ. P. 65.05(3). The trial court reasoned that the Rule, providing the enjoined party with a remedy for challenging the sufficiency of a bond together with authorizing the trial court to vacate the injunction if sufficient security is not given, implies that an insufficient bond does not void the issuance of an injunction but rather makes the injunction voidable. The trial court observed that jurisdictions are split as to whether the failure to post the required injunction bond makes the injunction issued void *ab initio*, or voidable until the injunction is vacated. November 21, 2000 Order (quoting 42 Am. Jur. 2d, *Injunctions* § 291 (2000)). Given the fact that Rule 65.05(3) provides a remedy for inadequate security, the trial court held that Tennessee would adhere to the view that an injunction based on inadequate security is voidable, not void. Under that view, the injunction is voidable "until either an undertaking is provided or the injunction is vacated, and the enjoined party's sole remedy is to seek to compel the procuring party to file the undertaking." ***Id.***

The trial court also relied upon the reasoning in a federal case that decided a similar issue. In *Popular Bank of Florida v. Banco Popular de Puerto Rico*, 180 F.R.D. 461 (S.D. Fla. 1998), the defendants received the trial court's preliminary injunction order, but soon thereafter engaged in the prohibited conduct. The defendants asserted that they were not bound by the injunction until the trial court ruled on the posting of security under Rule 65(c) of the Federal Rules of Civil Procedure, which is essentially identical to the Tennessee Rule 65.05(1). The trial court disagreed. The court determined that the failure to include the bond requirement with its preliminary injunction order did not render the preliminary injunction order invalid or without effect. *Popular Bank*, 180 F.R.D. at 465. Noting that the defendants had other means of raising the issue of the sufficiency of the bond, the trial court held that, "if the defendants believe that the preliminary injunction was procedurally defective for failure to post bond, before violating the preliminary injunction the defendants should have filed a timely motion to require the plaintiff to post bond." *Id.* at 466.

The trial court below in this case also looked to other Tennessee cases indicating that Tennessee would follow those jurisdictions holding that an injunction is voidable, not void *ab initio*, if it is based on inadequate security. *See Nashville Corp.*, 215 S.W.3d at 820 (holding that the picketers, who alleged that the injunction violated their constitutional rights, were not free to speculate on legality of the injunction; rather, the injunction must be obeyed while it continued in force); *Pyott Land & Mining Co. v. Tarwater*, 150 S.W. 539, 540 (Tenn. 1912) (holding that damages cannot exceed amount of bond, and that the defendants can protect themselves by applying to the trial court to increase the amount of the bond). In addition, Overnite cites *Taylor v. Morris*, No. 01A01-9804-CH-00211, 1999 WL 675138 (Tenn. Ct. App. Sept. 1, 1999), in which a party alleged that he was wrongfully enjoined and sought to recover on the injunction bond. Due to oversight, however, the trial court had not required the party that obtained the injunction to post an injunction bond before the subject restraining order was issued. The appellate court noted the lack of a bond, but allowed the claim to proceed on a malicious prosecution theory. Citing *Pyott Land & Mining*, the appellate court stated that "it was incumbent upon [the wrongfully enjoined party] to bring this oversight to the attention of the trial court in a timely manner." *Taylor*, 1999 WL 675138, at *11 n.5.

We agree with the trial court's conclusion on this issue, as well as its reasoning. When the bond posted is found to be insufficient, Rule 65.05(3) provides a remedy, allowing the enjoined party to "move the court for additional security." The Rule provides further that if the bond is found to be insufficient, "the court may vacate the restraining order or temporary injunction unless within a reasonable time sufficient security is given." This language indicates that the injunction is vacated *by the court*, and that this does not happen automatically in the absence of action by the court. This is consistent with established law that a party must obey an injunction while it is in force and may not ignore the order based on the party's opinion that it is unenforceable. *See Nuclear Fuel Servs., Inc. v. Local No. 3-677, Oil, Chem. & Atomic Workers Int'l Union*, 719 S.W.2d 550, 552 (Tenn. Ct. Crim. App. 1986) ("These contemnors cannot disregard with impunity an order from a court which had jurisdiction of the subject matter."); *Stream v. Stream*, No. 01-A-019201-CV-00011, 1992 WL 184771, at *2 (Tenn. Ct. App. Aug. 5, 1992) ("However erroneous, the order must be obeyed until it is set aside.").

-13-

The Union also argues that the injunction was invalid *ab initio* because the order included "self-executing" language requiring a bond to be posted by noon on November 1, 1999, and conditioned the effectiveness of the order on the posting of such bond, and because Overnite failed to strictly comply with these terms.[16] On the undisputed facts, the trial court apparently did not disregard the specific provisions of its October 29, 1999 order; rather, it found that these provisions were substantially fulfilled. We find no error in the trial court's conclusion, particularly in light of the fact that the Union made no objection at the time to the trial court's acceptance of the late bond. Therefore, we affirm the trial court's holding that the injunctions were not void because the bond posted by Overnite was defective or insufficient.

Under these circumstances, the dismissal of Overnite's petition for civil contempt must be reversed, and the cause remanded for further proceedings. The individual defendants emphasize that the trial court's show cause order was directed to the Union, and not to the individual defendants, and that the individual defendants are not named parties to the contempt proceedings. The trial court did not address this issue, and may address any issues regarding the individual defendants on remand.

We next address Overnite's assertion on appeal that the trial court erred in dismissing Overnite's claim for intentional interference with business relations. In its August 9, 2002 order, the trial court concluded that Overnite's claim was legally and factually insufficient. In reaching that conclusion, the trial court noted that Overnite stipulated that it was not asserting a claim for interference with prospective economic advantage. Rather, Overnite maintained that the Union had interfered in the relationship between Overnite and its employees and the security guards hired to protect employees and others from the strike-related violence and intimidation. The trial court concluded that, because there was no claim of interference with prospective economic advantage, Overnite's claim was in reality a claim of inducement to breach. A necessary element of a claim of inducement to breach is that damages must arise from a breach of contract. Because the averments in the complaint did not allege that damages were suffered from the inducement of a breach, the trial court dismissed Overnite's claim on the face of the complaint. In the alternative, the trial court granted summary judgment against Overnite on its claim of interference with business relations, because Overnite proffered no evidence that contracts between Overnite and its employees and security guards were breached or terminated because of the alleged wrongful conduct of the Union. Therefore, Overnite's claim for intentional interference was dismissed based on the face of the complaint and on summary judgment as well.

On appeal, Overnite asserts that the trial court erred in holding that it was required to allege and prove the existence of a breached contract in order to recover for intentional interference, because the existence of a contract is not an element of such a claim. Overnite maintains that its amended complaint contained all of the required elements of a claim for intentional interference with business relationships.

---

[16] Arguably, the language in the trial court's October 29, 1999 order is not self-executing, in that it does not provide specifically that the injunction is void if a sufficient bond is not posted by the required date.

-14-

In reviewing the sufficiency of Overnite's complaint under Tennessee Rule of Civil Procedure 12.02(6), the complaint must be viewed in a light most favorable to Overnite, and all reasonable inferences must be drawn in its favor. A complaint cannot be dismissed for failure to state a claim unless there is no set of facts to support the claim. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 696 (Tenn. 2002).

In January 2000, Overnite amended its original complaint to include a claim for intentional interference with business relationships. That claim was based on the same facts as Overnite's request for injunctive relief. The pertinent allegations in the amended complaint regarding intentional interference are as follows:

> 43. Overnite has valid business relationships with its customers, vendors, and its employees.
>
> 44. Prior to October 24, 1999, Defendants had knowledge of Overnite's business relationships with its customers, vendors, and employees.
>
> 45. Defendants' misconduct was tortious and interfered with the employment relationship between Overnite and its employees by adversely impacting the safe work environment that Overnite maintains for its employees.
>
> 46. As a direct result of this tortious conduct, Defendants interfered with Overnite's legitimate business relationships with its employees, customers and vendors and caused breaches in these relationships. . . .
>
> 47. Defendants' tortious misconduct proximately caused Overnite significant damages including, but not limited to, increased employee payroll expense resulting from Defendants' delaying of Overnite employees in the performance of his or her assigned duties, increased service cost by delaying freight to customers, increased costs for security guards and related equipment, costs associated with reimbursing employees for damage to their personal vehicles, and loss of goodwill with its customers.

Though the complaint includes allegations of intentional interference with respect to Overnite's relationship with its customers, Overnite represented to the trial court that it intended to pursue its claims only with respect to Overnite's relationships with its employees and security guards, and that it did not seek recovery for loss of prospective economic advantage.[17]

---

[17] Such representations were also made at the appellate oral argument.

In *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691 (Tenn. 2002), the Supreme Court of Tennessee stated that a plaintiff seeking to recover on a claim for intentional interference with business relationships must show the following:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons;
>
> (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general;
>
> (3) the defendant's intent to cause the breach or termination of the business relationship;
>
> (4) the defendant's improper motive or improper means, . . . and finally,
>
> (5) damages resulting from the tortious interference.

*Trau-Med*, 71 S.W.3d at 701 (footnotes omitted). Thus, a claim for intentional interference requires an allegation of damages from tortious interference, not necessarily damages resulting from a breach of contract.

Nevertheless, in light of *Trau-Med*, it is apparent that Overnight's complaint falls short of stating a claim for relief in many respects. Under *Trau-Med*, an intentional interference claim must allege interference with "an existing business relationship with specific third parties." There are no specific third parties named in the complaint, only general categories of persons, such as "employees."

In addition, Overnite's complaint does not assert that the Union intended to cause a breach in Overnite's relationships with its employees and security guards.[18] The complaint stated that "Defendants' misconduct was intentional and interfered with the employment relationship between Overnite and its employees by adversely impacting the safe work environment that Overnite maintains for its employees." Overnite argues that this is sufficient to show that the Union intentionally caused a breach of a "business relationship." In our view, however, the allegation that the Union's conduct "was intentional" does not satisfy the requirement of alleging that the Union intended to cause a breach in the business relationship at issue. Rather, Overnite must allege that the Union intentionally caused a breach in Overnite's relationships. This the complaint fails to do.[19]

---

[18] Overnite's allegation that the strike-related misconduct "interfered" with Overnite's business relationship with the security guards does not make sense. The security guards were hired *because of* the strike-related misconduct; the guards' job duties were to protect employees and others from the violent and intimidating behavior. Thus, the misconduct would not "interfere" with these duties.

[19] The Union argues that *Trau-Med* should not be applied retroactively in this case, and that Overnite's claim must be dismissed because Tennessee did not recognize a cause of action for intentional interference with business relationships pre-*Trau-Med*. Because of our conclusion herein, this argument need not be addressed.

For these reasons, we conclude that the trial court did not err in dismissing Overnite's claim for intentional interference with business relationships, pursuant to Rule 12.02(6) of the Tennessee Rules of Civil Procedure, for failure to state a claim. This holding pretermits other issues raised in this appeal.

The decision of the trial court is affirmed in part and reversed in part as set forth above, and the case is remanded for further proceedings not inconsistent with this Opinion. Costs on appeal are to be taxed equally to Appellant Overnite Transportation Company, and its surety, and Appellee Teamsters Local Union No. 480, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE